BROWNE WOODS GEORGE LLP
Allan Browne (State Bar No. 34923)
*abrowne@bwgfirm.com*
Edward A. Woods (State Bar No. 54841)
*ewoods@bwgfirm.com*
Susan K. Leader (State Bar No. 216743)
*sleader@bwgfirm.com*
Amanda L. Morgan (State Bar No. 246277)
*amorgan@bwgfirm.com*
2121 Avenue of the Stars, 24th Floor
Los Angeles, CA 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

Attorneys for Defendants
CONDOR PACIFIC INDUSTRIES OF CALIFORNIA, INC. and SIDNEY I. MELTZNER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

ATLANTIC INERTIAL SYSTEMS, INC.,

Plaintiff,

vs.

CONDOR PACIFIC INDUSTRIES OF CALIFORNIA, INC., and SIDNEY I. MELTZNER,

Defendants.

Case No. CV 08-02947 JHN (PJWx)

**DEFENDANTS' [REDACTED] NOTICE OF MOTION AND MOTION FOR EVIDENTIARY AND ISSUE PRECLUSION SANCTIONS, MONETARY SANCTIONS, AND DISMISSAL OF COUNTS 3 AND 5 BASED ON WITHHOLDING OF EVIDENCE**

[Declarations of Susan K. Leader, Thomas Fulkerson, and Cher Gibson Filed Concurrently Herewith]

[Proposed Order filed concurrently herewith]

Date: November 15, 2010
Time: 10:00 a.m.
Dept: Courtroom 790

**TO THIS HONORABLE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, on November 15, 2010, or as soon thereafter as the matter may be heard in Courtroom 790 of the above-captioned Court, located at 255 East Temple Street, Los Angeles, California 90012, defendants Condor Pacific Industries of California, Inc. and Sidney I. Meltzner will move this Court for an order (1) precluding plaintiff Atlantic Inertial Systems, Inc. ("AIS") from introducing any evidence of alleged damages or alleged irreparable harm resulting from defendants' misappropriation of trade secrets and unfair competition, (2) finding that AIS was not harmed and will not be harmed (irreparably or otherwise) by defendants' misappropriation and unfair competition, and (3) dismissing Counts 3 and 5 of AIS' First Amended Complaint based on AIS' inability to establish essential elements of those claims (to wit, damage to AIS or the irreparable injury necessary to support entry of a permanent injunction against defendants). Defendants will also move for an order awarding monetary sanctions to defendants and against AIS in an amount to be established by subsequent declaration.

This Motion is brought pursuant to Rules 26 and 37(b) and (c) of the *Federal Rules of Civil Procedure* based on the facts that AIS (1) failed to disclose pursuant to Rule 26 the identity of crucial witnesses and the existence of critical documents that contradict its claims to have suffered damage and irreparable injury from defendants' alleged misappropriation of trade secrets, (2) failed to produce the same documents in discovery despite repeated requests, and (3) stonewalled and sought to prevent defendants from using this evidence once its existence was (serendipitously) discovered, all of which has caused substantial prejudice and expense to defendants and threatens to interfere with the rightful decision of the case. The Motion is based on the accompanying Memorandum of Points and Authorities and separately submitted Declarations of Susan K. Leader, Thomas

BROWNE WOODS GEORGE LLP

1   Fulkerson, and Cher Gibson, the files and record in this case, and such other and

2   further evidence and argument as may be submitted at or before the hearing on this

3   Motion.  This Motion is made following meet and confer correspondence and an in-

4   person conference pursuant to LR 7-3 that occurred October 8 and 14, 2010,

5   respectively.

6

7   Dated:  October 18, 2010          BROWNE WOODS GEORGE LLP
                                      Allan Browne
8                                     Edward A. Woods
                                      Susan K. Leader
9                                     Amanda Morgan

10                                    By ____/S/ Susan K. Leader_____
                                           Susan K. Leader
11

12                                    Attorneys for Defendants CONDOR PACIFIC
                                      INDUSTRIES OF CALIFORNIA, INC. and
13                                    SIDNEY I. MELTZNER

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

260960_1.DOC                          -2-

[REDACTED] MOTION FOR SANCTIONS AND DISMISSAL

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION..........................................................................................1

II.   STATEMENT OF FACTS. .........................................................................3

    A.   AIS' Claims Of Misappropriation Of Trade Secrets And Common Law Unfair Competition, And Defendants' Defenses Thereto. ......................................................................................................3

    B.   Rule 26 Disclosures. ...........................................................................4

    C.   Defendants Request – But Do Not Receive – Information And Documents Relating To AIS' Internal Valuation of the 1 ¾" and 2" Rate Gyro Lines And Discontinuation of the Same. ....................4

    D.   The Intervention Of Counsel In The Gyrodata Litigation. ...................6

    E.   AIS Instead Continues To "Stonewall". ..............................................8

    F.   AIS Finally Produces A Small Handful Of Documents, But Opposes Additional Discovery And A Trial Continuance. ..................9

    G.   AIS Opposes Defendants' Ex Parte Application For Additional Discovery And A Trial Continuance. ....................................................10

    H.   AIS Prematurely Moves For A Permanent Injunction Before Defendants Even Receive The Project Raven Documents Or Take The Depositions Authorized By The Court. .............................11

    I.   AIS Continues to "Hide The Ball." .....................................................11

    J.   AIS Obtains Terminating Sanctions. ..................................................13

    K.   The Project Raven Documents Contradict AIS' Claims, And Establish The Lack Of Monetary Harm Or Irreparable Injury. ..........14

        1.   The Withheld Documents Undermine And Contradict The Damages Analysis Of AIS' Expert. ............................................14

        2.   The Project Raven Documents Show Clearly That AIS Has Been Untruthful In Denying That It Discontinued The Majority of the 1 ¾" and 2" Product Lines Prior to 2006. ..............................................................................................16

III.  SANCTIONS SHOULD BE IMPOSED ON AIS BASED ON ITS FAILURE TO PROVIDE MATERIAL EVIDENCE. ............................18

    A.   The Court Should Enter Evidence And Issue Preclusion Sanctions. ..........................................................................................19

    B.   The Court Should Also Dismiss The Third And Fifth Counts Of AIS' First Amended Complaint. ......................................................22

    C.   The Court Should Also Issue Substantial Monetary Sanctions. ..........23

IV.   CONCLUSION. ....................................................................................24

- i -

[REDACTED] MOTION FOR SANCTIONS AND DISMISSAL

# **TABLE OF AUTHORITIES**

**Page**

## **CASES**

*Bratka v. Anheuser-Busch Co.,*
  164 F.R.D. 448 (S.D. Ohio 1995) .......................................................... 24

*Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills,*
  482 F.3d 1091 (9th Cir. 2007)........................................... 18, 21

*Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills,*
  482 F.3d 1091 (9th Cir. 2007)................................... 18, 21, 22

*Hoffman v. Construction Protective Servs., Inc.,*
  541 F.3d 1175 (9th Cir. 2008) .................................................. 19

*Holtsinger v. Voros,*
  2009 WL 1769136 (E.D. Cal., June 23, 2009)....................... 19

*U.S. v. Sumitomo Marine & Fire Ins. Co.,*
  617 F.2d 1365 (9th Cir. 1980) ................................................ 19

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,*
  259 F.3d 1101 (9th Cir. 2001) ................................................ 18

## **STATUTES**

*Federal Rules of Civil Procedure*
  Rule 26........................................... 1, 4, 6, 13, 18, 22, 24
  Rule 34............................................................................. 5
  Rule 30(b)(6) ............................................................... 5, 6
  Rule 37(c) ..................................................................... 18
  Rule 37(c)(1)(C) ........................................................... 18
  Rule 37(b)(2)(C) ........................................................... 24

- ii -

[REDACTED] MOTION FOR SANCTIONS AND DISMISSAL

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION.

Scene from the movie *Casablanca* (1942):

**Captain Renault:** "I'm shocked, shocked to find that gambling is going on in here!"

[a croupier hands Renault a pile of money]

**Croupier:** "Your winnings, sir."

**Captain Renault:** [sotto voce] "Oh, thank you very much."

**Captain Renault:** [aloud] "Everybody out at once!"

Mere months ago, plaintiff Atlantic Inertial Systems, Inc. ("AIS") claimed to have been shocked and outraged that defendants Condor Pacific Industries of California, Inc. ("Condor") and Sidney I. Meltzner had failed to produce documents pursuant to Rule 26 of the *Federal Rules of Civil Procedure*. AIS parlayed its shock and outrage into a sanction order (Document 162) whereby this Court determined that defendants are guilty of misappropriation of trade secrets and common law unfair competition.

Now, in a display of hypocrisy that would make even Casablanca's Captain Renault blush, it turns out that AIS itself has all along been withholding key documents that not only should have been produced **more than two years ago** pursuant to Rule 26, **but that also were expressly requested by defendants in discovery *multiple times***. Those documents – known as the "Project Raven" documents – could not be more relevant, and more devastating, to AIS' case.

Those documents show that AIS' claim of nearly **$5 million** in damages is entirely fabricated and that AIS can establish neither monetary harm nor the existence of irreparable injury. This is for the simple reason that **AIS suffered no harm from defendants' claimed misappropriation** of trade secrets related to the low volume, "non-core product lines" at issue in this lawsuit. To the contrary, AIS discontinued the vast majority of the products at issue in this lawsuit years prior to

BROWNE WOODS GEORGE LLP

defendants' entry in the market. As set forth in the recently discovered Project Raven memoranda, AIS did not believe these products were even worth the nominal transactional cost of selling them to a third party. (Leader Decl., Ex. J, at AIS 012925). Rather than disclosing this to defendants, AIS has represented to defendants (and the Court) that these product lines (and the associated drawing packages) were worth millions and denied that it discontinued making these same products in 2006 when AIS' predecessor, BAE Systems Aerospace Inc. ("BAE") closed the Westlake Village facility.[1]

Yet, even after the existence of these critical documents was discovered – solely through the entirely fortuitous intervention of counsel in an unrelated case – AIS fought "tooth and nail" to prevent defendants from obtaining and using them. AIS opposed defendants' reasonable request for a trial continuance and additional limited discovery, played "shell games" with defendants (claiming that its predecessor, BAE, had sole possession of many of the documents), and delayed for months before finally turning over the Project Raven documents less than two weeks ago. In the meantime, AIS filed a premature application for permanent injunction **before even producing the Project Raven documents** to defendants in an effort to prevent defendants from using the damaging admissions contained therein. Even now, AIS continues to withhold other critical documents relating to Project Raven, such as underlying emails sent by Ms. Marinello and Mr. Loughren that Mr. Siegel testified he relied on in generating the Project Raven memoranda.

Under applicable law, including that cited by this Court in its June 30, 2010, Order imposing terminating sanctions on defendants (Document 162), this Court

---

[1] The same document values the product lines at issue [REDACTED] but acknowledges that [REDACTED] (Leader Decl., Ex. J, at AIS 012925.) It concludes that [REDACTED] (*Id.*, at 012928, 012930.) This best case sale value of [REDACTED] must be contrasted with AIS' intent to present to the jury expert testimony estimating the damages from the misappropriation of this "obsolete," non-core," "decades-old" product line at nearly **$5 million.**

BROWNE WOODS GEORGE LLP

should enter an order (1) precluding AIS from introducing any evidence of claimed damages or alleged irreparable harm resulting from defendants' misappropriation of trade secrets and unfair competition, (2) finding that AIS was not harmed and will not be harmed by defendants' misappropriation and unfair competition, and (3) dismissing Counts 3 and 5 based on AIS' inability to establish essential elements of those claims – compensable damage or the irreparable injury necessary to support entry of a permanent injunction.

## II. STATEMENT OF FACTS.

### A. AIS' Claims Of Misappropriation Of Trade Secrets And Common Law Unfair Competition, And Defendants' Defenses Thereto.

The claims to which this motion is addressed are found in Counts 3 and 5 of AIS' First Amended Complaint ("FAC"). AIS alleged that defendants misappropriated trade secrets relating to the manufacture of AIS' 1 ¾" and 2" rate gyros previously manufactured at BAE's now-closed Westlake Village facility. AIS has alleged that, after Mr. Meltzner sold his business to BAE, defendants used the intellectual property (*i.e.*, the drawing packages for the subject gyros and parts) to manufacture and sell gyros in competition with AIS. (FAC, ¶¶ 80-81.) AIS claims to have suffered both millions of dollars in damages and irreparable harm, and has retained an expert (Neil Beaton) who estimates AIS' claimed damages to be $4,579,300. (Leader Decl., Ex. L, ¶ 26.)

Defendants, however, have believed from the outset that AIS was not manufacturing the low volume, low margin 1 ¾" and 2" rate gyro lines at issue in this lawsuit. Indeed, defendants alleged that AIS discontinued those product lines when it closed its Westlake Village facility in early 2006, and terminated all of the employees knowledgeable about these products. In doing so, AIS left its customers (including the U.S. Government) without a source for these products. Based thereon, defendants have contended that AIS could not have been harmed by any

BROWNE WOODS GEORGE LLP

alleged misappropriation of the 1 ¾" and 2" gyro lines because AIS discontinued manufacturing them years before defendants began supposedly competing.

### B. Rule 26 Disclosures.

As required by Rule 26 of the *Federal Rules of Civil Procedure*, the parties made their initial disclosures in October 2008. AIS produced documents as part of those Rule 26 disclosures, **but produced no documents pertaining to (1) any valuation of the 1 ¾" and 2" rate gyro lines, (2) the possible discontinuation of those lines, or (3) their possible sale.** (Leader Decl., ¶ 5.) Likewise, though AIS identified several numerous current and former employees as having information about the case, it did not identify the persons involved in "Project Raven" (i.e., J.H. Burr, Martin Cox, Lawrence Goodkin, Thomas F. Loughren, Carol Marinello, Ehtisham Siddiqui, Greg White and Arthur Siegel). Given that the Project Raven analysis directly concerns AIS' claim for damages, AIS was required to disclose this information pursuant to Rule 26. (*Ibid.*)

### C. Defendants Request – But Do Not Receive – Information And Documents Relating To AIS' Internal Valuation of the 1 ¾" and 2" Rate Gyro Lines And Discontinuation of the Same.

As noted, defendants have alleged from the outset that AIS placed little to no value on the low-volume, low-margin 1 ¾" and 2" rate gyro lines and ultimately discontinued production of those lines because it was not worth the time and expense associated with transitioning the production effort to Cheshire, Connecticut. To support their contention, defendants served a number of discovery requests seeking documents and information regarding AIS' discontinuation of the subject product line, or potential sale of the associated intellectual property to anyone, including Mr. Meltzner.

Specifically, as long ago as ***February 2009***, defendants served a document demand seeking, among other documents: **"All DOCUMENTS REGARDING any potential sale of the drawings of the 21 gyroscopic devices and associated**

BROWNE WOODS GEORGE LLP

**components listed in Exhibit A to YOUR COMPLAINT to Sidney Meltzner"** and **"All DOCUMENTS REGARDING any proposal to discontinue the manufacture of *any* of the 21 gyroscopic devices"** listed in Plaintiff's Complaint. (Leader Decl., Ex. A, RFP Nos. 126, 127, emphasis and italics added.) Even though these requests encompass the subject 1 ¾" and 2" gyros, **AIS produced no documents in response to Request Nos. 126 and 127.** (Leader Decl., ¶ 5.)

Nevertheless, because defendants were aware of the fact that Mr. Meltzner himself had tried to engage in discussions with AIS' predecessor, BAE, about purchasing these lines, defendants **tried again**. In ***August 2009***, they propounded their *Second* Set of Requests for Production pursuant to Rule 34. Request No. 5 therein specifically requested: **"All DOCUMENTS REGARDING AIS's potential sale of any or all of the WESTLAKE RATE LINE to any PERSON, including but not limited to Sidney I. Meltzner."** (Leader Decl., Ex. B, RFP No. 5, emphasis added.) **Once again, however, AIS did not disclose any of the Project Raven documents**. (*Id.*, ¶ 5.)

Defendants tried a different tack. They noticed, pursuant to Rule 30(b)(6), the deposition of the person at AIS most knowledgeable about various subjects, including discussions at AIS concerning the actual or potential discontinuation of any or all parts from the subject product lines. (Leader Decl., Ex. C.)[2] In response, AIS produced its client representative Matthew Hunter, who did not even join the company until a few months before the close of the Westlake Village facility, and

---

[2] Specifically, the deposition notice asked AIS to identify and produce for deposition the person knowledgeable about, *inter alia*, the following topics:

> AIS's business discussions from October 2005 to the present REGARDING future production of the PARTS.
>
> * * *
>
> AIS's business discussions REGARDING the actual or potential discontinuation of the 1 3/4" and/or 2" Rate Gyros.
>
> AIS's business discussions REGARDING the actual or potential discontinuation of the Westlake Rate Line. (Leader Decl., Ex. C.)

BROWNE WOODS GEORGE LLP

whose name is conspicuously **absent** from the Project Raven documents. Mr. Hunter failed to educate himself about the Project Raven prior to his PMK deposition, and did not provide any testimony regarding AIS' plan to discontinue or sell the product lines that are the subject of this lawsuit. (Leader Decl., ¶ 4.)

Thus, through the close of discovery, AIS continued to insist that it had no documents reflecting any internal valuation placed upon the 1 ¾" and 2" product lines. It also continued to deny that it had discontinued the manufacture of the gyros that comprised these lines. Plaintiff failed to disclose even the existence of Project Raven, much less identify any of the witnesses or produce any of the documents relating to this analysis as required by Rule 26 or in response to defendants' Rule 30(b)(6) deposition notice.

AIS, it thought, had successfully hidden these damning documents and critical witnesses from defendants. In fact, it nearly got away with its suppression of this crucial evidence. Fortunately for defendants, and the truth, fate intervened in the form of a phone call from another lawyer litigating against AIS.

**D. The Intervention Of Counsel In The *Gyrodata* Litigation.**

During the pendency of this lawsuit, AIS and its predecessor, BAE Systems Aerospace Inc., also have been embroiled in a lawsuit with a company named Gyrodata Inc., entitled *Gyrodata Incorporated v. Atlantic Inertial Systems, Inc.*, currently pending in the Central District before the Honorable George H. King (Case No. V-08-7897). That litigation is unrelated to this action. Unbeknownst to defendants here, however, at the very same time that they were requesting documents relating to AIS' evaluation and potential sale of the Westlake product lines, **and AIS was claiming that it had no such documents**, AIS was producing these precise documents to Gyrodata in the unrelated *Gyrodata* case.

Defendants did not know this until they received a phone call from Gyrodata's counsel, Thomas Fulkerson, in **July 2010**. Mr. Fulkerson contacted counsel for defendants, Allan Browne, and informed him that AIS had produced

BROWNE WOODS GEORGE LLP

certain documents in the Gyrodata litigation that would be relevant to AIS' claim for damages in this action. (Fulkerson Decl., ¶ 5.) Although Mr. Fulkerson could not describe in detail the content of the documents due to a protective order in the *Gyrodata* case, Mr. Browne confirmed that AIS had not produced here any documents valuing the 1 ¾" and 2" rate gyro lines. (Fulkerson Decl., ¶ 5.)

Mr. Fulkerson sent a demand letter to the counsel representing AIS in the *Gyrodata* case (Kit Winter of Dykema) and the counsel representing AIS in this litigation (George Newhouse of Brown White & Newhouse). A redacted copy of Mr. Fulkerson's letter, dated July 8, 2010, is attached as Exhibit A to Mr. Fulkerson's declaration. In it, Mr. Fulkerson pointed out that AIS (and BAE) had produced **to Gyrodata** documents consisting of "'self assessments' of the value of the rate gyro line" but that Mr. Fulkerson had learned that those same documents had **never been provided to defendants in this case**. He insisted that these documents be produced to defendants immediately, pointing out that any attempt to proceed to trial in this case without producing these documents would be "fraudulent upon the Court." (Fulkerson Decl., ¶ 6, Ex. A.)

Incredibly, despite having been caught "red-handed," AIS took no action. It did not produce the Project Raven documents to defendants here, or even respond to Mr. Fulkerson. (Fulkerson Decl., ¶ 7; Leader Decl., ¶ 6.) When the documents had not been produced by July 26, 2010, Mr. Browne's colleague, Susan Leader, contacted Mr. Fulkerson. (Leader Decl., ¶ 6.) Mr. Fulkerson stated that he too had not heard from either of AIS' counsel in response to his July 8 letter. (*Ibid.*) Mr. Fulkerson also again asked whether AIS had produced documents reflecting an internal valuation of the rate gyro line in connection with a potential sale of that business. Ms. Leader confirmed that, although these documents were requested in discovery, AIS had produced no such documents. (*Ibid.*) Mr. Fulkerson stated that AIS had produced such documents to him and that he would follow up with AIS to make sure that these documents were provided to defendants. (*Ibid.*)

On July 29, Ms. Leader and Mr. Fulkerson spoke again. (Leader Decl., ¶ 7.) Mr. Fulkerson stated that he still had not received a response to his July 8 letter, but had met and conferred with counsel for AIS (Kit Winter) and BAE (Mary Sue Henifin) in the *Gyrodata* litigation on July 28. At that time, he had requested that the documents in question be de-designated as "confidential" so that they could be provided to counsel for defendants in this case. (Fulkerson Decl., ¶ 9; Leader Decl., ¶ 6.) (A copy of Mr. Fulkerson's meet and confer request is attached as Exhibit C to the Fulkerson Declaration.)

The next day, July 30, Ms. Leader met with counsel for AIS in this case, George Newhouse and Steven Heath, to discuss pre-trial matters. (Leader Decl., ¶ 10.)[3] During this meeting, Mr. Newhouse stated that he had just become aware of the fact that there were certain documents, namely the Project Raven memoranda, produced by AIS and/or BAE in the *Gyrodata* litigation that were "clearly relevant" to the Condor litigation. (*Ibid.*) Mr. Newhouse said that he was still trying to discern whether the documents were produced by AIS or BAE but that he would provide defendants with a copy of the documents *as soon as possible.* (*Ibid.*)

**E. <u>AIS Instead Continues To "Stonewall"</u>.**

When another week passed without AIS producing any of the documents, Ms. Leader emailed Mr. Newhouse and Mr. Heath on August 5 asking when the "Project Raven" memoranda would be produced. (Leader Decl., Ex. F.) Mr. Newhouse responded that AIS was still working "to access the documents in a form that is not restricted by confidentiality provisions." (*Ibid.*) Ms. Leader responded that, in light of the fact that these documents had been produced by AIS almost one year earlier in another lawsuit, defendants did not intend to wait while AIS decided whether, and in what form, to produce these documents. (*Ibid.*)

[3] Defendants emphasize that they do not assert any claims of malfeasance against AIS' counsel, whom defendants believe were equally misled by AIS as AIS sought to hide from defendants (and the Court) the documents that destroy its claim of harm and put to rest its claim that AIS continued to manufacture the subject products after closing the Westlake facility in early 2006.

BROWNE WOODS GEORGE LLP

The parties met and conferred again on August 6. Mr. Newhouse stated that, while AIS was still working on the confidentiality restrictions, he expected to produce the documents the following week. (Leader Decl., ¶ 12.) Mr. Newhouse also stated, however, **and for the first time**, that BAE (not AIS) had sole possession of many of the documents and that these documents were not in AIS' custody or control. Ms. Leader inquired as to how this could be given that the product line (and related intellectual property) all passed to AIS as part of BAE's stock and asset sale to AIS. Mr. Newhouse responded that, while he did not know why BAE had retained the documents, **defendants should have asked about this earlier or thought to subpoena BAE!** (*Ibid.*)

Mr. Newhouse also stated that the Project Raven memoranda "changed nothing" and that AIS likely would oppose any effort to continue the trial date and conduct discovery based on the new evidence that had been improperly withheld for nearly two years. (Leader Decl., ¶ 12.)

**F. <u>AIS Finally Produces A Small Handful Of Documents, But Opposes Additional Discovery And A Trial Continuance</u>.**

When AIS still had not produced any of the documents by August 10 – **more than a month after Mr. Fulkerson had blown the whistle on AIS' misconduct** – Ms. Leader again inquired as to the status of AIS' production of the Project Raven memoranda. (Leader Decl., Ex. G.) Ms. Leader also requested that AIS agree to a continuance of the trial so as to allow defendants to conduct discovery regarding this as-yet unproduced evidence. (*Ibid.*)

Later that same day, Mr. Newhouse sent a letter to Ms. Leader and, at long last, enclosed 22 pages of documents. (Leader Decl., Ex. H.) Mr. Newhouse stated that there still remained other "relevant documents" that "may be of interest" that had been produced by BAE in the *Gyrodata* litigation, but claimed that AIS could not produce these documents as they were covered by the protective order in the *Gyrodata* litigation. (*Ibid.*)

Though paltry and woefully incomplete,[4] even this limited production contained dramatic and damning admissions that contradict AIS' claims. These included ***admissions*** that (1) the subject product line had ***diminishing value***, (2) that the product line ***lacked strategic value*** and had, at best, a ***nominal sale value*** to potential buyers, and (3) that AIS planned to ***discontinue*** that product line rather than move it to Cheshire, Connecticut. (Leader Decl., ¶ 15, Ex. I.)

Despite the damning nature of the documents – or, more likely, ***because*** of their damning nature – AIS would not agree to a 90-day continuance of trial or to further discovery based on those documents. (Leader Decl., Ex. H.) AIS instead forced defendants to seek such relief *ex parte*. (Leader Decl., ¶ 17.)

**G. AIS Opposes Defendants' *Ex Parte* Application For Additional Discovery And A Trial Continuance.**

Despite having failed to produce documents that its counsel admitted were "clearly relevant" until more than a year after the close of discovery, AIS thereafter did everything it could to prevent defendants from ***using*** the newly produced Project Raven documents and the critical admissions contained therein. First, it opposed defendants' *ex parte* application for a continuance of trial and opposed defendants' request to reopen discovery (save for a single deposition) regarding the belatedly produced Project Raven documents. (Leader Decl., ¶ 16.)

In opposing defendants' request, AIS blithely asserted that the damaging Project Raven documents "merely corroborate existing evidence well known to Defendants" (Document 173, at 5:2-3) and sought to divert attention from its own wrongdoing by continuously referring to the conduct of defendants that had resulted in this Court's June 30, 2010 sanction order, which was entirely unrelated to

[4] The 22 pages produced on August 10, 2010 are but a small fraction of the documents that had been improperly withheld. The Project Raven documents also include more than **600 additional pages** that were not produced by AIS **until October 5 and 7, 2010, two months later** – just before the commencement of the additional depositions this Court permitted defendants to take, as well as 303 pages of documents received from BAE on October 6. (Leader Decl., ¶ 22.)

defendants' *ex parte* application. (*Id.*, at 1:4-8, 1:23-24, 2:10-11, 3:19-20, 7:16-20.)

This Court, however, was not persuaded by Mr. Newhouse's assertion that the documents "changed nothing" and granted defendants' application, continuing trial until December 14, 2010, and permitting additional depositions concerning Project Raven. (Leader Decl., ¶ 18; Document 179.)

**H. AIS Prematurely Moves For A Permanent Injunction Before Defendants Even Receive The Project Raven Documents Or Take The Depositions Authorized By The Court.**

Realizing how devastating the Project Raven documents are to its claim to have been harmed by defendants' adjudicated misappropriation, AIS next sought to preempt the discovery authorized by this Court. Having already secured the order finding that defendants had misappropriated trade secrets and engaged in unfair competition, AIS filed a premature, ***pre-trial*** motion for permanent injunction. It did so even before it had produced the vast majority of the Project Raven documents, and before defendants had had the opportunity to depose the AIS and BAE employees involved in Project Raven. (Leader Decl., ¶ 21.)

AIS thus asked this Court to "rush to judgment" to prevent defendants from making use of the long-withheld documents once AIS' deceit had been discovered. Realizing that its claims of harm had gone "up in flames" in light of the admissions in the Project Raven documents, it sought to render those documents moot and avoid the consequences of its misconduct by prematurely seeking the ultimate remedy of a permanent injunction.

**I. AIS Continues to "Hide The Ball."**

As noted, AIS claimed that it did not have possession of many of the Project Raven documents, and the documents instead were solely in the possession of BAE (for unexplained reasons). Defendants therefore were forced to subpoena BAE. (Leader Decl., ¶ 19.) This of course resulted in further delay.

It was not until October 5 and 7, 2010, **three months after Mr. Fulkerson brought the matter to AIS'** attention, that AIS produced 600 more pages of Project Raven documents. This production took place well after AIS had filed its injunction motion, and less than a week before the start of the Project Raven depositions in New York. (Leader Decl., ¶ 22.) Moreover, disproving its own prior representations that it did not have custody or control of the BAE documents, AIS for the first time disclosed in that production the very BAE documents it previously had claimed it did not possess and could not produce! It did so, of course, because it knew that defendants were about to get those documents anyway, having been forced by AIS' "shell game" to *subpoena* them from BAE directly. (*Id.*, ¶ 22.) By its "shell game," AIS delayed production for two additional months, ultimately producing the documents just one day before it knew that BAE would produce them, and less than a week before the depositions were to begin.

In addition, it has become clear that **AIS is still withholding documents**. The Project Raven documents reference other projects that likewise involved AIS' valuation of, and plans for, the 1 ¾" and 2" rate gyro lines. One such project is "Project Hawk." According to the Project Raven documents, Project Hawk involved, among other things, the preparation of an internal allocation of the $58.5 million purchase price BAE paid for the entirety of Condor. (Leader Decl., Ex. O, at AIS 012726.) This allocation of course would include a line item assigning some portion of the total purchase price to the 1 ¾" and 2" lines – an important factor in evaluating AIS' claimed damages from the misappropriation of that those lines. Indeed, AIS' damages expert, Neil Beaton, specifically asked AIS for such an allocation to assist him in his analysis but was told that AIS "couldn't find it." (Beaton Depo. (Leader Decl., Ex. P), at 142:22-143:18.)

Similarly, the documents produced also make reference to a "Project Crossroads." That project evidently also included some analysis of a "1.75 and 2 [inch] gyro sale," *i.e.*, a sale of the 1 ¾" and 2" rate gyro lines. (Leader Decl., Ex.

BROWNE WOODS GEORGE LLP

Q, at 2BAE000001.) On October 12, 2010, Lawrence Goodkin, a former AIS employee, confirmed in deposition that Project Crossroads was a project "to close down [the] Westlake Village [facility] and vacate it," and that a sale of the 1 ¾" and 2" rate gyro lines may have been discussed as part of Project Crossroads. (Goodkin Depo. (Leader Decl., Ex. R), at 146:14-149:24.)

In addition, Art Siegel, one of the authors of the Project Raven memoranda, testified that he based his narrative in part on information provided by his co-authors (Carol Marinello and Thomas Loughren) via email. (Leader Decl., ¶ 27.) To date, however, AIS has not produced any Project Hawk documents, despite demands that it do so. (Leader Decl., ¶ 31, Ex. S.) Nor has it produced any documents related to any valuation or potential sale of the 1 ¾" and 2" rate gyro lines as part of Project Crossroads or any of the emails on which Siegel based his memoranda. (*Id.*, ¶ 31.)

**J. <u>AIS Obtains Terminating Sanctions</u>.**

Ironically, while AIS was withholding the key Project Raven documents (among others), AIS was simultaneously complaining that **defendants** had withheld documents that should have been included in defendants' Rule 26 disclosures. Ultimately, based upon defendants' failure **to disclose certain drawings that were abandoned by BAE in defendants' facility**, AIS secured an order imposing terminating sanctions on defendants, dated June 30, 2010. (Document 162.) In that Order, the Court found as a result of defendants' failure to produce those drawings that AIS had established the misappropriation of trade secrets pleaded in Count 5 of the FAC and that this misappropriation also established defendants' unfair competition under Count 3 of the FAC. Now, however, it is clear that AIS, while decrying defendants' failure to turn over documents, was itself concealing crucial documents that destroy its claim to have been damaged or irreparably harmed by this misappropriation and unfair competition.

BROWNE WOODS GEORGE LLP

BROWNE WOODS GEORGE LLP

**K. The Project Raven Documents Contradict AIS' Claims, And Establish The Lack Of Monetary Harm Or Irreparable Injury.**

The reason AIS suppressed Project is obvious. The documents contradict AIS' claims that (a) it did not discontinue the subject product lines, (b) it suffered nearly $5 million in damages from defendants' misappropriation of trade secrets related to those lines, and (c) it will suffer irreparable injury in the future unless a permanent injunction is issued. For example:

**1. The Withheld Documents Undermine And Contradict The Damages Analysis Of AIS' Expert.**

AIS' expert, Neil Beaton, prepared a report opining that AIS suffered **$4,579,300** in damages from defendants' use of trade secrets related to the 1 ¾" and 2" lines to manufacture supposedly competing gyros. His analysis is infected, however, by AIS' failure to provide him with both the Project Raven and the Project Hawk documents.

Beaton began his analysis with the total purchase price – $57.5 million – paid by BAE for the entirety of Condor's business. Because this included far more than the misappropriated lines, however, he needed documents allocating the total purchase price among the various product lines. This information was so important that he "asked anybody who would listen to me. The attorneys, Mr. Hunter." (Beaton Depo. (Leader Decl., Ex. P), at 143:9-10.) He was not provided with this documentation, however, and instead was told that AIS "couldn't find it." (*Id.*, at 143:16-18; Beaton Expert Report (Leader Decl., Ex. L), ¶¶ 10-11.)

In fact, we now know from the Project Raven documents that precisely such an allocation exists as part of Project Hawk. (Leader Decl., Ex. O, at AIS 012726.) Yet AIS continues to withhold that document from defendants and its own expert.

Nevertheless, lacking BAE's allocation of the purchase price, Beaton made up his own allocation of the value of the misappropriated product lines.[5] But, in so

[5] Beaton explains in his report:

doing, he likewise was not shown the Project Raven documents establishing that BAE (a) considered these "decades-old" lines to consist of "non-core product lines" that were "obsolete" and whose sales would "decline over the next few years", and (b) therefore decided **even before defendants' misappropriation** to discontinue the manufacture and sale of those products. Beaton's allocation is therefore constructed of whole cloth and contradicted by the Project Raven (and, likely, the still-suppressed Project Hawk) documents.

As a result of AIS' suppression of these critical documents from its own expert, Beaton was able to conclude that the same assets that AIS valued at essentially zero were instead worth millions![6]

---

> As an alternative measure of damages caused by the alleged actions of the Defendants, the value of the intangible assets acquired by BAE can serve as a basis to analyze the value of specific intangible assets allegedly misappropriated by Condor II from January 2007 through November 2009. Specifically, the value that can be attributed to Condor I's drawings, customers, trade name, part numbers and goodwill, all items allegedly misappropriated by Condor II, would form a proxy of the unjust enrichment Condor II gained by their allegedly improper actions. Unfortunately, the original purchase price allocation documentation was not available as of the writing of this Report. As such, an alternative analysis was performed.
>
> Condor I provided [financial statements] . . . . Based on these financial statements, "Net Assets" amounted to $38,195,000 as of December 31, 2001, indicating $20,305,000 was paid by BAE for the intangible value of Condor I [$58,500,000 - $38,195,000 = $20,305,000].

Beaton then used this $20.3 million figure as the basis for his damage computation. (Leader Decl., Ex. L, ¶¶ 10-11.)

6 The suppression of the exceedingly low valuation revealed in the Project Raven documents and the continuing failure to provide the Project Hawk allocation also allowed counsel to perpetuate the false argument that the fact that the $57.5 million BAE paid for the entire business equates to damages of millions of dollars for the misappropriation of product lines that AIS in reality considered basically worthless. Thus, counsel for AIS recently argued to the Court in its briefing:

> **The $57 Million Mr. Meltzner Received in 2002 is Highly Relevant As It Shows AIS Paid a Significant Sum for Condor I's Intellectual Property, Including the Trademarks and Trade Secrets at the Heart of this Lawsuit**.
>
> . . . .

BROWNE WOODS GEORGE LLP

2. **The Project Raven Documents Show Clearly That AIS Has Been Untruthful In Denying That It Discontinued The Majority of the 1 ¾" and 2" Product Lines Prior to 2006.**

The Project Raven documents that AIS improperly withheld also confirm what Defendants have alleged all along, but that AIS has falsely disputed: that AIS decided to discontinue the 1 ¾" and 2" gyro lines years <u>before</u> Condor began making the subject parts. (*See, e.g.,* Leader Decl., Exs. J – K; *see also id,* Ex. T.)

Matthew Hunter, who testified both in his individual capacity and as the person most knowledgeable at AIS pursuant to Rule 30(b)(6), flatly denied under oath that AIS had discontinued *any* of the parts at issue in this lawsuit. (*See, e.g.,* Leader Decl., Exs. M [July 21, 2009 Hunter Tr. 284:22-25 and July 23, 2009 Hunter Tr. 401:5-8] and N [Oct. 9, 2009 Hunter Tr. 20:9-11; 129:17-19; 158:7-9].) Likewise, AIS alleged in its First Amended Complaint that "AIS recognizes approximately $1 to $2 million in revenue through the sale of the Parts [at issue in this suit] on an annual basis." (FAC ¶ 14.)

Contrary to Mr. Hunter's assertions and AIS' representations, AIS discontinued most of the products at issue years before Condor started its business. Within one year of BAE's December 2002 purchase, BAE decided to close the production facility in Westlake Village, and consolidate production in Connecticut. (Gibson Decl. ¶ 4.) At this time, BAE began internal discussions about the divestiture of certain "non-core, low volume" product lines, primarily the 1 ¾" and 2" rate gyro lines, manufactured at Westlake Village. (*See, e.g.,* Leader Decl., Exs. J and K.) Because BAE concluded that these lines were not even worth the cost of

. . . We say: let the jury decide whether the intellectual property that reflected 40 years of Mr. Meltzner's creative genius and hard work was worth at best only $500,000 (which is the simple arithmetic of this ludicrous claim), or many millions of dollars.

Plaintiff's Opposition to Defendants' Motion in Limine No. 2 to Exclude Evidence and Argument Regarding the Sale Price Paid for Old Condor in 2002 (Docket No. 89), pp. 4:11-13, 5:25-6:3.

260960_1.DOC

-16-

[REDACTED] MOTION FOR SANCTIONS AND DISMISSAL

BROWNE WOODS GEORGE LLP

transitioning the manufacturing process to Chesire, BAE assembled a team to conduct a valuation to determine the price at which it could reasonably expect to sell these lines. (*Id.*)

The newly-produced documents show that this team concluded in 2005 that the 1 ¾" and 2" rate gyro lines, which were based on "decades-old" designs used in obsolete military aircraft, had no strategic relevance, and that these already low-volume lines would experience declining sales in the upcoming years. (*Id.*) The documents further demonstrate that BAE valued those product lines [REDACTED] but acknowledged that [REDACTED] (Leader Decl., Ex. J, at AIS 012928.) It estimated that a sale would bring "[REDACTED] but would require a "difficult" negotiation and would result in [REDACTED] in sale-related costs. (*Id.*, at 012928, 012930.)

BAE recognized that the only person who realistically might be interested in purchasing those product lines was Mr. Meltzner, because Mr. Meltzner would value the prospect of providing jobs to the former Condor employees who soon would be terminated. (*Id.*) The documents further reveal that BAE intended, if it did not sell the 1 ¾" and 2" rate gyro lines, to discontinue manufacturing those gyros. (Leader Decl., Ex. J, at AIS 012928.) BAE ultimately decided that, given the low potential sales price and the transactional costs associated with such a sale, **the most cost-effective option was to discontinue these product lines rather than even attempt to sell them**. (*See* Leader Decl., Exs. J, K and T.)

BAE later did precisely that. It closed the Westlake Village facility in **April 2006** and terminated all of the Westlake employees. (Gibson Decl. ¶ 5.) It discontinued all of the gyros and parts associated with the 1 ¾" and 2" gyro lines, with the exception of the TRU gyro series (PN 11700), which BAE was obligated to transfer to Chesire to meet existing contractual requirements. (*Id.*) After those obligations were fulfilled, AIS discontinued the TRU in late 2008 or early 2009.

BROWNE WOODS GEORGE LLP

(Leader Decl., Exs. U, V.)[7]

## III. SANCTIONS SHOULD BE IMPOSED ON AIS BASED ON ITS FAILURE TO PROVIDE MATERIAL EVIDENCE.

Rule 37(c) of the *Federal Rules of Civil Procedure* specifies that the Court shall issue sanctions against a party that fails to comply with its obligations under Rule 26 and/or fails to cooperate in discovery. For example, Rule 37(c) states that, where a party fails to identify documents or witnesses, the Court shall exclude those documents and witnesses. Recognizing that this type of sanction does not fit the situation here, where a party **fails to produce information damaging to its own case**, Rule 37(c) also authorizes the Court to enter other sanctions, including issue and evidence preclusion sanctions and terminating sanctions. Rule 37(c)(1)(C).

An award of sanctions under Rule 37(c) is mandatory unless the offending party – AIS – establishes that its failure to comply with Rule 26 was "substantially justified" or "harmless." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). Here, AIS cannot establish that its failure to produce documents and identify witnesses that contradict its claim to have suffered nearly $5 million in damages was either "substantially justified" or "harmless."

AIS has not even sought to argue justification and, as discussed below, its actions caused substantial harm both to *defendants*, who have incurred substantial expense and prejudice in first preparing their case for trial without the Project Raven documents and then in having to "switch gears" to obtain and then reconfigure their defense and trial strategies based on the belatedly-provided Project Raven discovery, and to the Court's ability to "manage its docket" and "the public's interest in expeditious resolution of litigation." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007).

7 Following this discontinuation, AIS has only made one bid on a contract for the TRU. Significantly, AIS did not submit that bid until June of this year, the same month as the Court's terminating sanctions Order (Document 162).

### A. The Court Should Enter Evidence And Issue Preclusion Sanctions.

Defendants submit that AIS' conduct requires substantial sanctions, in the form of an evidence and issue preclusion order. The imposition of such sanctions does not require a showing of willfulness. Instead, such "[p]reclusionary orders ensure that a party will not be able to profit from its own failure to comply." *U.S. v. Sumitomo Marine & Fire Ins. Co.*, 617 F.2d 1365, 1369 (9th Cir. 1980).

As long as they are not based on an "inability" to comply or "circumstances beyond the disobedient party's control," and instead are imposed on one who "is, in some sense, at fault," even preclusion orders that are tantamount to dismissal are appropriate. *U.S. v. Sumitomo Marine & Fire Ins.*, *supra*, 617 F.2d at 1369; *cf.*, *Hoffman v. Construction Protective Servs., Inc.*, 541 F.3d 1175, 1180 (9th Cir. 2008) ("we reject the notion that the district court was required to make a finding of willfulness or bad faith to exclude the damages evidence"); *Holtsinger v. Voros*, 2009 WL 1769136, *6 (E.D. Cal., June 23, 2009) ("[w]hile bad faith may be relevant to the determination of what sanctions are appropriate, sanctions are appropriate even for negligent failures").

Here, there is no question but that AIS' failure to produce the Project Raven documents or to identify their authors for more than two years was not due to any "inability" to comply with these obligations or "circumstances beyond the disobedient party's control," and that AIS instead "is, in some sense, at fault." *U.S. v. Sumitomo Marine & Fire Ins.*, supra, 617 F.2d at 1369. Indeed, though not required to establish that AIS acted "willfully" or in bad faith, defendants believe that the evidence establishes precisely that.

For example, when caught with its hand in the cookie jar, AIS claimed that "the existence of these documents was unknown to Plaintiff **for purposes of this lawsuit** until last month [July 2010]." (Document 173, at 1:20-21, emphasis added.)[8] This assertion is as disingenuous as it is insulting. AIS added the

[8] AIS claimed in the same document to have been merely "unlucky" in failing

BROWNE WOODS GEORGE LLP

nonsensical qualifier "for purposes of this lawsuit" because the documents quite obviously **were** known to it. At precisely the time that the defendants were asking for the Project Raven documents in this lawsuit, and AIS was claiming to have looked for them and determined that they did not exist, **AIS was reviewing and producing those very documents to Gyrodata!**

That AIS' failure to produce these critical documents was not merely negligent or "unlucky" is also confirmed by the actions AIS took once Gyrodata's counsel "blew the whistle" on AIS' fraud. Instead of immediately rectifying the situation, AIS sought to "run out the clock," stonewalling repeated requests for the documents while opposing defendants' reasonable request that trial be continued and that they be permitted to conduct discovery pertaining to these documents. AIS sought by this conduct to ensure that it would be too late for defendants to make use of the damaging admissions contained in the Project Raven documents.

Though this attempt to subvert the process failed – the Court continued the trial and authorized defendants to take additional discovery – AIS was not finished. It then played a shell game with defendants, first claiming that only BAE had many of the documents in question, then producing the BAE documents **months later** (but only on the eve of the Project Raven depositions and just before defendants were set to obtain the documents from BAE anyway). And, realizing that its damages theory was in tatters, it shifted gears and immediately filed a premature motion for permanent injunction. It filed that motion even before it had produced the vast majority of the more than 600 pages of Project Raven documents, and before defendants had had the opportunity to take the deposition of even one of the persons whose identities were first revealed in the belatedly-produced documents. AIS thus **again** sought to prevent defendants from using the admissions contained

---

to locate the same documents it located and produced to Gyrodata. (Document 173, at 13:8.) To the contrary, AIS was "unlucky" only in that (a) Mr. Fulkerson discovered AIS' attempt to defraud defendants (and the Court), *and* (b) was principled enough to take action to prevent AIS from succeeding in its fraudulent suppression of critical evidence.

BROWNE WOODS GEORGE LLP

in the Project Raven documents – admissions which negate any claim of irreparable injury – to oppose AIS' injunction motion.

These facts establish that, even after being "caught red-handed," AIS did not do the honorable thing. Instead, it dragged its feet in producing the documents while doing everything in its power to prevent defendants from being able to make use of those documents once they were received (more than two years after they should have been voluntarily produced). And, if yet more evidence were required (it is not), the fact that AIS ***still has not produced all relevant documents*** speaks volumes. Thus, even though the Project Raven documents make reference to other projects and documents that again go directly to the valuation placed by AIS on the 1 ¾" and 2" lines (*e.g.*, Project Hawk and Project Crossroads), those documents still are being withheld.

Nor can AIS argue "no harm, no foul." Indeed, its conduct, and the harm it has caused, would be sufficient to warrant even a terminating sanction under *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007), though defendants do not ask for such a sanction.

AIS' misconduct thus has interfered both with "the public's interest in expeditious resolution of litigation" and "the court's need to manage its docket." *Connecticut Gen. Life Ins.*, *supra*, 42 F.3d at 1096. They caused a substantial trial continuance *and* a re-opening of discovery, prolonging the resolution of this case and requiring the Court to expend judicial resources that could have been preserved had AIS complied with its discovery obligations and its obligations under Rule 26.

In addition, defendants have been prejudiced and will continue to be prejudiced. *Connecticut Gen. Life Ins.*, *supra*, 42 F.3d at 1096. They were forced to spend substantial time and money seeking and obtaining a continuance of the trial, and engaging in a last-minute, multi-city, "if its Tuesday, this must be Newark" deposition tour necessitated by AIS' failure to disclose the Project Raven documents. In addition, much of defendants' prior work is now wasted, including

BROWNE WOODS GEORGE LLP

the time spent "chasing their tails" in preparing to rebut what now has been established to be a completely fabricated claim of nearly $5 million in damages, and trying to establish by other means what the Project Raven documents clearly show – the lack of value and abandonment by AIS of the product line in question.

**Perhaps most importantly, neither defendants nor the Court have any way of knowing what else AIS may have hidden.** Defendants would never have learned about the Project Raven documents absent the fortuitous intervention of Mr. Fulkerson, counsel in the unrelated *Gyrodata* litigation, who brought AIS' fraud to defendants' attention. Significantly, AIS even now has produced **only those documents that defendants *already know exist* by virtue of Mr. Fulkerson's unusual intervention** and has failed to produce other documents such as the Project Hawk and Project Crossroads documents summarized above. Neither defendants nor the Court can ever know what else AIS may have withheld.

Based on this record, defendants submit that the only remedy that will vindicate this Court's authority, deter future violations, and right the wrong caused by AIS' misconduct is evidence and issue preclusion sanctions. Specifically, AIS should be prevented, as a result of its failure to produce key evidence that negates its fabricated claim of damages, from introducing any evidence of any alleged damages or alleged irreparable harm resulting from defendants' misappropriation of trade secrets and unfair competition. Likewise, the Court should enter an order finding that AIS (a) was not harmed and (2) will not be harmed (irreparably or otherwise) by that misappropriation and unfair competition. Absent such sanctions, there is a very real threat that AIS will successfully have thwarted "the rightful decision of the case." *Connecticut Gen. Life. Ins.*, *supra*, 42 F.3d at 1096.

### B. <u>The Court Should Also Dismiss The Third And Fifth Counts Of AIS' First Amended Complaint.</u>

After issuance of the requested evidence and issue preclusion sanction, the Court also should dismiss Counts 3 and 5 of AIS' First Amended Complaint. The

BROWNE WOODS GEORGE LLP

Court should do so because AIS will be unable to establish essential elements of those claims. Once AIS is prevented from introducing any evidence of damages, and is found not to have been damaged, it cannot establish this essential element of a claim for monetary relief. Likewise, once the Court precludes AIS from introducing evidence of irreparable injury, and finds that there has been no such injury, AIS cannot establish an essential prerequisite to its claim for injunctive relief. With no ability to recover monetary or injunctive relief, Counts 3 and 5 of necessity fail and should be dismissed.

### C. **The Court Should Also Issue Substantial Monetary Sanctions.**

In addition to the sanctions discussed above, the Court should award monetary sanctions to defendants pursuant to Rule 37(b)(2)(C). AIS' violation of Rule 26, and its failure to comply with defendants' discovery demands, has caused defendants to incur substantial, and continuing, expenses. These expenses include, but are hardly limited to, the attorneys' fees and costs incurred in:

- Working with Mr. Fulkerson and "meeting and conferring" with counsel for AIS to obtain the Project Raven documents;
- Presenting an *ex parte* application – opposed by AIS – for a trial continuance and additional discovery;
- Preparing to rebut at trial AIS' fraudulent claim to have suffered nearly $5 million in damages, including the retention of an expert witness to rebut the damages testimony of the AIS expert (from whom AIS likewise withheld the Project Raven documents);
- Preparing to establish the facts contained in the Project Raven documents (*i.e.*, that AIS discontinued the subject products) through other means due to AIS' failure to produce those documents (*e.g.*, attempting to develop this theory through AIS's purported person most knowledgeable, Mr. Hunter);
- Recasting their defenses and trial strategies in light of the Project

BROWNE WOODS GEORGE LLP

Raven revelations;

- Conducting a last-minute, six-deposition, four-city tour to depose the various witnesses who should have been identified more than two years ago (and while defendants should be preparing for trial); and
- Preparing this motion.

Because defendants continue to incur costs caused by AIS' failure to comply with Rule 26 and its discovery obligations, defendants request that the Court enter an order that they are entitled to recover the reasonable attorneys' fees caused by AIS' misconduct. Thereafter, once *all* such costs have been incurred, defendants can "meet and confer" with AIS to determine the amount to be paid by AIS. If the parties disagree, the matter can then be presented to the Court. This, of course, is the procedure the Court adopted in its June 30, 2010 Order imposing sanctions upon defendants. (Document 162, at 13:10-19.)

## IV. <u>CONCLUSION</u>.

Defendants do not bring this motion to play "tit-for-tat," or merely because "what's sauce for the good is sauce for the gander." They bring this motion because AIS' misconduct has irreparably tainted this litigation. "If litigants are to have any faith in the discovery process, they must know that parties cannot fail to produce highly relevant documents within their possession with impunity. Parties cannot be permitted to jeopardize the integrity of the discovery process by engaging in halfhearted and ineffective efforts to identify and produce relevant documents." *Bratka v. Anheuser-Busch Co.*, 164 F.R.D. 448 (S.D. Ohio 1995).

Even now, however, defendants cannot be sure that they have all of the relevant documents (in fact, it appears that they do not), or that they have identified all of the key witnesses. Instead, only those documents and witnesses that defendants learned about through the fortuitous intervention of Mr. Fulkerson have been produced. Because AIS' actions "threaten to interfere with the rightful

BROWNE WOODS GEORGE LLP

decision of the case," and because AIS would have gotten away with its suppression of material evidence absent Mr. Fulkerson's voluntary intervention, strong sanctions must be imposed.

Defendants respectfully submit that the Court can vindicate its authority and assure the "rightful decision of the case" only by entry of an order (1) precluding plaintiff AIS from introducing any evidence of alleged damages or alleged irreparable harm resulting from defendants' misappropriation of trade secrets and unfair competition, (2) finding that AIS was not harmed and will not be harmed (irreparably or otherwise) by defendants' misappropriation and unfair competition, and (3) dismissing Counts 3 and 5 of AIS' First Amended Complaint based on AIS' inability to establish essential elements of those claims (damage to AIS or the irreparable injury necessary to support entry of a permanent injunction).

Dated: October 18, 2010

BROWNE WOODS GEORGE LLP
Allan Browne
Edward A. Woods
Susan K. Leader
Amanda Morgan

By /S/ Susan K. Leader
Susan K. Leader
Attorneys for Defendants CONDOR PACIFIC INDUSTRIES OF CALIFORNIA, INC. and SIDNEY I. MELTZNER