UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

'O'   JS-6

| Case No. | 2:08-cv-02947-CAS(PJWx) | | Date | June 18, 2015 |
|---|---|---|---|---|
| Title | ATLANTIC INERTIAL SYSTEMS INC. V. CONDOR PACIFIC INDUSTRIES OF CALIFORNIA, INC. ET AL. | | | |

| Present: The Honorable | CHRISTINA A. SNYDER | |
|---|---|---|
| Catherine Jeang | Not Present | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiff: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**   (IN CHAMBERS): ORDER RE: PLAINTIFF'S REQUEST FOR AWARD OF A REASONABLE ROYALTY

In February and March of 2011, this trade secret case was tried to a jury by the Court, the Hon. Judge Jacqueline H. Nguyen, United States District Judge, presiding.[1] On March 4, 2014, the jury returned a complete defense verdict. Dkt. 300. Subsequent to the verdict, plaintiff filed a motion requesting, among other things, that Judge Nguyen award a reasonable royalty pursuant to Cal. Civ. Code § 3426.3(b). Dkt. 306. On August 25, 2011, Judge Nguyen denied plaintiff's motion. Dkt. 345. Plaintiff appealed. On October 30, 2013, the Ninth Circuit issued a memorandum disposition reversing Judge Nguyen's order declining to award plaintiff a reasonable royalty. The Ninth Circuit remanded to this Court "to determine whether a royalty award is warranted and, if so, in what amount." Dkt. 372 at 3.

## I.    BACKGROUND[2]

### A.    The Original Action

In the 1960s, defendant Sidney Meltzner founded Condor Pacific Industries, Inc. ("Condor I") to manufacture gyroscopes. Condor I produced these gyroscopes for the

---

[1] Judge Nguyen has since been elevated to serve on the United States Court of Appeals for the Ninth Circuit.

[2] These facts and procedural history are adopted substantially from Judge Nguyen's orders on plaintiff's motion for terminating sanctions and motion for final adjudication. Dkts. 162, 345.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                                    'O'  JS-6

| Case No. | 2:08-cv-02947-CAS(PJWx) | Date | June 18, 2015 |
|---|---|---|---|
| Title | ATLANTIC INERTIAL SYSTEMS INC. V. CONDOR PACIFIC INDUSTRIES OF CALIFORNIA, INC. ET AL. | | |

U.S. military, which integrated them into aircraft as navigational devices.  In 2002, Meltzner sold Condor I, including all of its intellectual property, to BAE Systems Inertial Products ("BAE").  Plaintiff Atlantic Inertial Systems Inc. ("AIS") acquired BAE in 2007.

After expiration of the Condor I-BAE sale agreement's non-compete provision, Meltzner founded a new gyroscope-manufacturing corporation with the name Condor Pacific Industries of California, Inc. ("Condor II").  Condor II hired Condor I's former employees, and began operating out of Condor I's old plant in Westlake Village, California.

On May 6, 2008, AIS filed suit against Meltzner and Condor II ("defendants"), alleging that Condor II had misappropriated intellectual property that BAE owned by virtue of Meltzner's sale of Condor I.  AIS accused Meltzner of resurrecting Condor I and using the exact same gyroscopic drawings sold to AIS in order to sell nearly identical gyroscopes to the U.S. government.  AIS' First Amended Complaint ("FAC"), the operative pleading in this action, asserted claims for (1) false designation of origin, (2) infringement of a common law mark, (3) common law unfair competition, (4) misappropriation of trade secrets relating to pricing information, (5) misappropriation of trade secrets related to drawing packages, (6) state law unfair competition and (7) interference with prospective economic advantage.  Dkt. 37.

In discovery, AIS sought to uncover evidence that Condor II's gyroscopes were based on Condor I designs.  As part of this investigation, AIS served a subpoena *duces tecum* on the Defense Supply Center Richmond ("DSCR"), a non-party government agency.  Condor II had applied to DSCR to become an approved supplier of gyroscopes to the military, and AIS sought to discover the documentation that Condor II had submitted in support of this application.  DSCR, concerned about disclosing potentially proprietary information, informed AIS that it would only provide the documents if it received Condor II's consent or a court order directing it to turn the documents over.

After substantial litigation over discovery issues, resulting in, among other things, the imposition of monetary sanctions on defendants, DSCR turned over the documents to AIS.  These documents, which included a number of gyroscope blueprints, evidenced direct copying from plaintiff's trade secrets, vindicating AIS's contention that Condor II

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES - GENERAL | | 'O'   JS-6 |
|---|---|---|---|
| Case No. | 2:08-cv-02947-CAS(PJWx) | Date | June 18, 2015 |
| Title | ATLANTIC INERTIAL SYSTEMS INC. V. CONDOR PACIFIC INDUSTRIES OF CALIFORNIA, INC. ET AL. | | |

had retained Condor I gyroscope designs. Indeed, the documents were duplicates of AIS' gyroscope drawings, with changes only to the company name, author, and date. Moreover, defendants had never turned over the DSCR documents, or any documents like them, during discovery, despite document production requests from AIS encompassing the blueprints at issue. In subsequent deposition testimony, Meltzner admitted that he did not disclose the DSCR documents even though he (1) had them in his possession and (2) understood that he was legally obligated to produce them. Defendants then argued, for the first time in the course of the litigation's two-year history, that AIS had "abandoned" the gyroscope blueprints when it moved operations out of the production facility in Westlake Village, CA ("the Westlake Facility"), which was later taken over by Condor II.

AIS moved for terminating sanctions. In an order issued on June 30, 2010, Judge Nguyen granted plaintiff's motion, finding that defendants' failure to turn over the DSCR documents had irreparably tainted the proceedings. Dkt. 162. Prior to the DSCR revelations, defendants had consistently adhered to a "reverse-engineering" defense, an assertion discredited by defendants' possession of blueprints for the very gyroscopes they claimed to have reverse-engineered. Moreover, Judge Nguyen found that the "manifest insincerity" of defendants' newly asserted "abandonment" theory demonstrated that defendants' misconduct had been willful, and suggested the potential for future litigation misconduct. Accordingly, Judge Nguyen imposed terminating sanctions against Condor II with respect to AIS' third claim (common law unfair competition) and fifth claim (misappropriation of trade secrets related to drawing packages).

The case subsequently proceeded to a jury trial on, among other issues, the monetary damages portion of AIS' third and fifth claims. At the end of the trial, the jury was given a special verdict form that asked, in pertinent part:

8. Was plaintiff harmed by defendants' misappropriation of plaintiff's drawings and associated technical performance data, and was defendants' misappropriation a substantial factor in causing harm, if any, to plaintiff?

Dkt. 300 at 12 (special verdict form). The jury answered this question, which had two subparts, in the negative.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          'O'  JS-6

| Case No. | 2:08-cv-02947-CAS(PJWx) | Date | June 18, 2015 |
|---|---|---|---|
| Title | ATLANTIC INERTIAL SYSTEMS INC. V. CONDOR PACIFIC INDUSTRIES OF CALIFORNIA, INC. ET AL. | | |

After the end of the trial, AIS moved for final adjudication.  Among other things, AIS requested that Judge Nguyen award it a reasonable royalty, pursuant to Cal. Civ. Code § 3426.3, a provision of the California Uniform Trade Secrets Act ("CUTSA"). Subsection 3426.3(b) provides that: "If neither damages nor unjust enrichment caused by misappropriation are provable, the court may order payment of a reasonable royalty for no longer than the period of time the use could have been prohibited."  Judge Nguyen denied the request, as follows:

> To prevail in a CUTSA claim, a plaintiff must establish harm.  See CytoDyn of New Mexico, Inc. v. Amerimmune Pharmaceuticals, Inc., 160 Cal. App. 4th 288, 297 (Cal. App. 2d Dist. 2008) ("Under the UTSA, a prima facie claim for misappropriation of trade secrets requires the plaintiff to demonstrate: (1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) **the defendant's actions damaged the plaintiff.**") (internal quotations omitted) (emphasis added) . . . .  Here, while the terminating sanctions established the first two elements, the jury found that Defendants' actions have not harmed Plaintiff. Therefore, the third element is not met and as a result AIS is not entitled to any form of relief under CUTSA.

Dkt. 345 at 7-8.

AIS appealed Judge Nguyen's order.  The Ninth Circuit affirmed in part and reversed in part.  While affirming the majority of the order, the Ninth Circuit reversed Judge Nguyen's denial of a reasonable royalty:

> The district court erred in ruling, at the damages stage, that the jury's finding of no harm precluded a reasonable royalty.  The statute provides for a reasonable royalty "[i]f neither damages nor unjust enrichment caused by misappropriation are provable." Cal. Civ. Code § 2426.3(b).  That requirement may be met by either a lack of sufficient evidence, or an adverse jury finding with respect to those forms of relief.  Ajaxo Inc.v. E*Trade Fin. Corp., 115 Cal. Rptr. 3d 168, 172-73 (Ct. App. 2010).  The jury's finding that Defendants did not proximately cause harm to Plaintiff is therefore consistent with the availability of a royalty under the statute.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES - GENERAL | | 'O'   JS-6 |
|---|---|---|---|
| Case No. | 2:08-cv-02947-CAS(PJWx) | Date | June 18, 2015 |
| Title | ATLANTIC INERTIAL SYSTEMS INC. V. CONDOR PACIFIC INDUSTRIES OF CALIFORNIA, INC. ET AL. | | |

Dkt. 372 at 2-3.  The Ninth Circuit remanded the case to this Court "to determine whether a royalty award is warranted, and, if so, in what amount."  Id. at 3.  On remand, this case was reassigned to the undersigned judge of this Court.  Dkt. 373.

### B.   Proceedings on Remand

On March 19, 2014, plaintiff and defendants filed Opening Briefs with this Court. Dkts. 384, 386.  The parties subsequently filed responses.  Dkts. 401, 404.  On June 23, 2014, the Court requested additional briefing regarding the standard to be employed in determining whether or not to grant a royalty pursuant to the CUTSA.  Dkt. 407.  The parties submitted the relevant briefing on July 7, 2014.  Dkt. 409, 411.

The parties disagree as to both the standard to be employed in determining whether or not to grant a royalty, as well as the method by which to calculate the royalty rate should the Court determine that a royalty is warranted.  Plaintiff has proposed a royalty of $1.55 million, relying largely on the expert analysis of Neil J. Beaton.  Dkt. 384.  In turn, Beaton's analysis relies on a gyroscope licensing agreement between AIS and non-party Instrument Tech ("the Instrument Tech Agreement").  On July 7, 2014, defendants filed a Motion to Strike the Instrument Tech Agreement and to exclude any evidence based thereon, asserting that plaintiff should have disclosed this contract several years earlier in response to defendants' discovery requests.  By order dated August 18, 2014, the Court denied defendants' motion to strike.  Dkt. 428.

The parties subsequently conducted limited written discovery into the Instrument Tech Agreement.  On November 21, 2014, the parties submitted a joint status report, in which they requested additional guidance from the Court before conducting further discovery.  Dkt. 430.  In response, the Court determined that further discovery was unnecessary, and advised the parties that the Court would render a decision on the merits of the royalty determination.  Dkt. 431.

## II.   DISCUSSION

The Court is charged by the Ninth Circuit's mandate with "determin[ing] whether a royalty award is warranted and, if so, in what amount."  Dkt. 372 at 3.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL    'O'  JS-6

| Case No. | 2:08-cv-02947-CAS(PJWx) | Date | June 18, 2015 |
|---|---|---|---|
| Title | ATLANTIC INERTIAL SYSTEMS INC. V. CONDOR PACIFIC INDUSTRIES OF CALIFORNIA, INC. ET AL. | | |

### A.    Whether a Royalty Should be Awarded

"A reasonable royalty is a court-determined fee imposed upon a defendant for his or her use of a misappropriated trade secret." Ajaxo, 187 Cal. App. 4th at 1308. The CUTSA permits an award of a reasonable royalty in two situations. As is relevant here, "[w]hen calculating a monetary remedy for the past use of a misappropriated trade secret, a court 'may order' reasonable royalties '[i]f neither damages [for actual loss] nor unjust enrichment caused by misappropriation are provable.' " Id. (quoting § 3426.3(b)) (alteration in original).[3] "In that situation a reasonable royalty is an attempt 'to measure a hypothetically agreed value of what the defendant wrongfully obtained from the plaintiff. By means of a 'suppositious meeting' between the parties, the court calculates what the parties would have agreed to as a fair licensing price at the time that the misappropriation occurred.' " Id. (quoting Vermont Microsystems, Inc. v. Autodesk, Inc., 138 F.3d 449, 451 (2nd Cir. 1998) and citing University Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518, 538 (5th Cir. 1974)).

The Court begins by observing that Ajaxo, the case relied on by the Ninth Circuit in reversing Judge Nguyen's determination that a royalty was unavailable, does not provide much direction about what factors should inform a trial court's exercise of its discretion to award such a royalty. Instead, Ajaxo limited itself to determining "whether unjust enrichment is 'provable' within the meaning of section 3426.3, subdivision (b), where the evidence of unjust enrichment is sufficient as a matter of law but the jury rejects it as a matter of fact." 187 Cal. App. 4th at 1310. The Ajaxo court answered this question in the negative, concluding that the trial court has discretion to award a reasonable royalty even where the victim of the misappropriation is unable to convince a jury that the misappropriating defendant profited from its actions. Id. at 1310-13.

---

[3] AIS appears to assert that, where unjust enrichment and damages are unprovable, Ajaxo mandates an award of a reasonable royalty. See AIS Open'g Br. at 10-11. However, both the plain language of the CUTSA, and Ajaxo itself, demonstrate that such an award is discretionary, not mandatory. Ajaxo, 187 Cal. App. 4th at 1301 ("[R]ecovery of a royalty is not guaranteed even where actual losses and unjust enrichment are not provable. [The CUTSA] provides only that the court 'may' award reasonable royalties in that situation.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**      'O'  JS-6

| Case No. | 2:08-cv-02947-CAS(PJWx) | Date | June 18, 2015 |
|---|---|---|---|
| Title | ATLANTIC INERTIAL SYSTEMS INC. V. CONDOR PACIFIC INDUSTRIES OF CALIFORNIA, INC. ET AL. | | |

Accordingly, the court remanded the matter "to allow the trial court to exercise its discretion," id. at 1315, without proffering express standards to govern that exercise.

The parties' supplemental briefing sheds some light on the subject.  Defendants, relying on Ajaxo and Altavion, Inc. v. Konica Minolta Sys. Lab. Inc., 226 Cal. App. 4th 26, 42 (2014), review denied, (Aug. 20, 2014), contend that "a plaintiff seeking a royalty must show (1) that at a 'suppositious meeting' between the parties at the time the misappropriation occurred, the parties would have agreed to a licensing price greater than zero, and (2) that the defendant has actually gained some intangible or incalculable benefit from the trade secrets."  Defs.' Br. Standard at 1.  Defendants argue that AIS has not made this showing.

AIS also relies on Ajaxo and Altavion, emphasizing public policy concerns raised by the Court of Appeal and asserting that both cases "affirm a clear presumption in favor of the trial court's award of a reasonable royalty."  Pl.'s Br. Standard at 4.  AIS agrees that the defendant must have benefitted from the misappropriation, "if not directly, in a non-pecuniary way," in order to justify a royalty award, but contends that this condition is satisfied since Condor II indisputably used AIS' trade secrets "to manufacture and sell gyroscopes [to the U.S. government] that directly competed with AIS' gyroscopes."  Id. at 4-5.  AIS contends that, under Altavion, the following factors inform the exercise of the Court's discretion to award a royalty: (1) whether defendants used the misappropriated trade secrets; (2) whether the trade secrets were obtained improperly; (3) whether costs were incurred in developing the trade secret in the first instance; and (4) whether the parties had previously considered a licensing agreement.  Id. at 6-7.  According to AIS, all of these factors weight in favor of awarding a royalty.

Both Ajaxo and Altavion lend some support to the parties' respective positions.  In Ajaxo, the plaintiff, a technology company specializing in wireless stock-trading software, entered into negotiations to license that software to E*Trade, an internet-based stock broker.  187 Cal. App. 4th 1295, 1300 (2010).  The negotiations, which were subject to a non-disclosure agreement, fell apart, and E*Trade subsequently partnered with Everypath, another vendor of wireless stock-trading software.  Suspecting that Everypath had developed its software with the aid of Ajaxo trade secrets acquired by E*Trade during the prior negotiations, Ajaxo sued E*Trade and Everypath for misappropriation of trade secrets.  Id. at 1301.  A jury found E*Trade liable for the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          'O'  JS-6

| Case No. | 2:08-cv-02947-CAS(PJWx) | Date | June 18, 2015 |
|---|---|---|---|
| Title | ATLANTIC INERTIAL SYSTEMS INC. V. CONDOR PACIFIC INDUSTRIES OF CALIFORNIA, INC. ET AL. | | |

misappropriation, but concluded that E*Trade had suffered a net loss, since its wireless trading business had failed despite the misappropriation.  Id. at 1303.  Ajaxo subsequently moved for a reasonable royalty under § 3426.3(b), which the trial court denied on the basis that unjust enrichment  was "provable," it simply had not been proven.  Id.

The Court of Appeal reversed, concluding that section 3426.3(b) permits a royalty award even where a defendant was not found as a matter of fact to have profited from his misappropriation.  Guided by considerations of public policy, the court reasoned that allowing misappropriators to gamble with other people's trade secrets would undermine "important standards of commercial ethics."  Id. at 1312.  Moreover, even if a defendant does not profit from a misappropriated trade secret, he may nonetheless achieve non-pecuniary benefits from the secret.  Id.  Ultimately, the Court of Appeal declined to "place the risk of loss on the wronged plaintiff, thereby discouraging innovation and potentially encouraging corporate thievery where anticipated profits might be minimal but other valuable but nonmeasureable benefits could accrue."  Id. at 1313.

In Altavion, the plaintiff, Altavion, sued Konica Monolta Systems Laboratory, Inc. ("KMSL") for misappropriation of trade secrets related to digital stamping technology developed by Altavion and disclosed to KMSL during failed negotiations regarding a cooperative measure.  226 Cal. App. 4th 26, 42 (2014).  Relying on Ajaxo and other unidentified cases, the trial court determined that Altavion could prove neither actual damages nor unjust enrichment, and awarded Altavion a $1 million royalty.  Id. at 67. The Court of Appeal affirmed the award, noting that the trial court had considered the following factors in awarding the royalty: (1) KMSL had not used the trade secrets in any product and, despite expending resources to accomplish that purpose, it lacked the present ability to do so; (2) KMSL acted unscrupulously, attempting to create its own technology by "piggy-backing" upon Altavion's technology when negotiations fell apart; (3) Altavion invested significant time and money developing the trade secrets; and (4) the parties had discussed a potential licensing agreement.  Id. at 68.

In discussing the equitable origins of the reasonable royalty standard and the purpose of its application, both the Ajaxo and Altavion courts relied on University Computing Co. v. Lykes-Youngstown Corp., 504 F.2d 518 (5th Cir. 1974).  Ajaxo, 187 Cal. App. 4th at 1313; Altavion, 226 Cal. App. 4th at 68-72.  In University Computing,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | **CIVIL MINUTES - GENERAL** | | **'O'  JS-6** |
|---|---|---|---|
| Case No. | 2:08-cv-02947-CAS(PJWx) | Date | June 18, 2015 |
| Title | ATLANTIC INERTIAL SYSTEMS INC. V. CONDOR PACIFIC INDUSTRIES OF CALIFORNIA, INC. ET AL. | | |

the defendant misappropriated a computerized inventory system from plaintiff, intending to sell the system to its own customers. 504 F.2d at 527-530. Despite marketing efforts, defendant had not actually sold the system before the misappropriation was discovered. Id. On appeal, the court affirmed the jury's verdict for plaintiffs on the misappropriation claim, and extensively examined the caselaw concerning the appropriate remedy for such claims. Addressing the propriety of application of the reasonable royalty measure, the court explained that "[c]ertain standards do emerge from the cases." Id. at 539. Specifically, in order to apply the measure, "[t]he defendant must have actually put the trade secret to some commercial use . . . [since] [t]he law governing protection of trade secrets essentially is designed to regulate unfair business competition, and is not a substitute for criminal laws against theft or other civil remedies for conversion." Id.

Taken together, the foregoing cases suggest that the following principles should inform the exercise of the Court's discretion to determine whether to award a royalty, and, if so, in what amount: (1) whether the defendant put the trade secret to commercial use; (2) whether some benefit, pecuniary or otherwise, accrued to the misappropriating defendant; (3) whether plaintiff incurred costs in developing the trade secret; and (4) whether the parties discussed a licensing agreement. Finally, the entire analysis must be informed by the role played by the law of trade secrets in maintaining "important standards of commercial ethics." Ajaxo, 187 Cal. App. 4th at 1312.

Applying these principles to the instant case, the Court concludes that an award of a royalty to AIS is appropriate. First and foremost, it is undisputed that defendants submitted gyroscopic drawings—which were direct copies of drawings sold by Condor I to BAE—to the U.S. government in order to obtain approval as a supplier of gyroscopes to the military. Defendants contend that the government representative who approved Condor II as a supplier "testified that he did not rely on the drawings in making his decision to approve Condor . . . and that '[t]he most important information [was] [Condor II's] desire to become an approved supplier.' " Defs.' Standard Br. at 6 (citing deposition testimony of Lieutenant Jacob English at 38:15-16). That the drawings were not the "most important" consideration does not mean that they were not considered. Indeed, Lieutenant English testified that he also relied on *the documents* submitted in support of Condor II's application, English Depo. at 338:4-9, which included the gyroscopic drawings, in addition to Condor II's representations that the company was "able to reproduce the gyroscopes and develop them *per the drawing package* and the [existing]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          'O'  JS-6

| Case No. | 2:08-cv-02947-CAS(PJWx) | Date | June 18, 2015 |
|---|---|---|---|
| Title | ATLANTIC INERTIAL SYSTEMS INC. V. CONDOR PACIFIC INDUSTRIES OF CALIFORNIA, INC. ET AL. | | |

requirements [of] the Air Force," id. at 44:11-13 (emphasis added). Thus, defendants'
commercial use of AIS' trade secrets to obtain government approval as a supplier of
gyroscopes supports a royalty award.

Further, defendants plainly obtained a benefit from their use of plaintiff's trade
secrets: a government contract to produce and repair gyroscopes. Defendants resist this
conclusion, likewise on the basis that the government's approval of Condor II as a
supplier was premised primarily on Condor II's willingness to become a supplier.
Defendants effectively contend that the submission of the gyroscopic drawings was not
the proximate cause of the government's approval decision. The Court finds no support
in defendants' briefing or otherwise for the proposition that the benefit accrued by a
defendant through the use of a misappropriated trade secret must accrue from the use of
the trade secret in isolation. To the contrary, as the University Computing court
explained, the reasonable royalty standard historically was used "to deal with the
situation where the misappropriated idea is used either to improve the defendant's
manufacturing process, or is used as part of a larger manufactured product." 504 F.2d at
536.

However, the third factor, the cost incurred by plaintiff in developing the trade
secret, weighs against awarding a royalty. The instant action diverges significantly from
the typical fact pattern in a trade secret case, where a defendant misappropriates a trade
secret from the party who created the trade secret in the first instance. Here in contrast,
any costs incurred to develop the instant trade secrets were incurred by defendant
Meltzner and his original company, Condor I. Although it is beyond dispute, as AIS
argues, that BAE paid valuable consideration to acquire defendants' trade secrets, the
caselaw contemplates the cost of innovation, not of acquisition. See, e.g., Ajaxo, 187
Cal. App. 4th at 1312 ("[S]tolen secrets might reveal that a particular avenue of inquiry
would be unsuccessful, thereby saving the defendant significant research and
development efforts."); Altavion, 226 Cal. App. 4th at 42 ("[T]rade secret law . . . permits
the individual inventor to reap the rewards of his labor by contracting with a company
large enough to develop and exploit it." (quoting DVD Copy Control Ass'n, Inc. v.
Bunner, 31 Cal. 4th 864, 871 (2003), as modified (Oct. 15, 2003)).

The fourth factor also weighs against granting a royalty, if only slightly. Although
AIS contemplated selling the 12000 series gyroscope line to Condor II in 2005, as

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES - GENERAL | | 'O'   JS-6 |
|---|---|---|---|
| Case No. | 2:08-cv-02947-CAS(PJWx) | Date | June 18, 2015 |
| Title | ATLANTIC INERTIAL SYSTEMS INC. V. CONDOR PACIFIC INDUSTRIES OF CALIFORNIA, INC. ET AL. | | |

discussed in greater detail infra, the parties did not actually engage in negotiations concerning such a sale.

Nonetheless, that trade secret law is intended to buttress "important standards of commercial ethics," weighs in favor of granting a royalty. As the California Supreme Court has explained, "by sanctioning the acquisition, use, and disclosure of another's valuable, proprietary information by improper means, trade secret law minimizes 'the inevitable cost to the basic decency of society when one . . . steals from another.' []. [And] [i]n doing so, it recognizes that 'good faith and honest, fair dealing, is the very life and spirit of the commercial world.' " DVD Copy Control Ass'n, Inc., 31 Cal. 4th at 881 (quoting Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 481-82, 487 (1974)). Defendants' actions evince little respect for such values. Although defendant Meltzner and AIS' predecessor, BAE, bargained for the sale and transfer of all of Condor I's intellectual property rights to BAE, Meltzner did not uphold his end of the bargain. Instead, he directly copied portions of his bargained-away intellectual property, and when confronted with evidence of this direct copying, he "shirk[ed] responsibility and fabricate[d] excuses." Term. Sanct. Order at 8. While such conduct may not discourage innovation, it fosters mistrust and cynicism in commercial dealings.

In short, when one company sells its trade secrets to another company, but nonetheless proceeds to put those very secrets to commercial use, commercial integrity suffers. Accordingly, it is appropriate for defendants to pay AIS a reasonable royalty for defendants' acts of misappropriation.

**B.   Scope of the Misappropriation**

Having determined that an award of a reasonable royalty is warranted, the Court turns to the scope of the misappropriation for which a royalty be awarded. AIS asserts that it is entitled to a royalty based upon defendants' alleged misappropriation of all of the gyroscope drawing packages acquired by BAE (now AIS) in its 2002 purchase of Condor I. Defendants, however, contend that AIS is only entitled to a royalty based upon defendants' misappropriation of drawings related to the 12000 series gyroscopes. Because AIS is only entitled to a royalty for those trade secrets that defendants have been found liable for misappropriating, see Cal. Civ. Code § 3426.3(b) (permitting award of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL        'O'  JS-6

| Case No. | 2:08-cv-02947-CAS(PJWx) | Date | June 18, 2015 |
|----------|--------------------------|------|----------------|

| Title | ATLANTIC INERTIAL SYSTEMS INC. V. CONDOR PACIFIC INDUSTRIES OF CALIFORNIA, INC. ET AL. |
|-------|----------------------------------------------------------------------------------------|

reasonable royalty in lieu of damages or unjust enrichment "caused by misappropriation"), the Court looks first to the Terminating Sanctions Order ("TSO") issued by Judge Nguyen to determine the scope of defendants' established misappropriation.

As is relevant here, the TSO imposed terminating sanctions on count five of plaintiff's first amended complaint for "misappropriation of trade secrets related to drawing packages." TSO at 2. In granting these sanctions, Judge Nguyen concluded that defendants had "misappropriated Plaintiff's trade secrets when they misrepresented to the DSCR that the BAE drawings were their own." Id. at 7, n.2. Although the TSO does not expressly state that the BAE drawings were limited to the 12000 series gyroscope, AIS' motion for terminating sanctions was specifically premised upon defendants' failure to produce the 12000 series drawings submitted to DSCR. Pl.'s Mot. Sanctions at 13. In its motion, moreover, plaintiff argued that defendants' failure to produce the 12000 series drawings merited sanctions since that failure unnecessarily required plaintiff to litigate defendants' claim that they "reverse engineered" the 12000 series drawings. Id. at 21-22. Indeed, the TSO itself underscores that sanctions are warranted because the documents withheld by defendants "defeat any reverse-engineering defense." TSO at 7. It is also telling that before this defense was debunked, plaintiff retained an expert witness to—in plaintiff's own words—"evaluate and analyze, and form an opinion as to whether or not the document set [the Condor II drawing packages for the 12000 series gyro] that was provided to [him] by Condor II could have been generated . . . as the result of reverse engineering." Dkt 92 at 5 (Pl.'s Consol. Opp'n to Defs.'s Mot. In Limine Nos. 4 & 5) (alterations in original).

The language of the parties' joint Statement of the Case and the Final Pretrial Conference Order further indicates that the TSO only established defendants' liability for misappropriation of the 12000 series gyroscope drawings. The Statement of the Case provides that the "Court has determined that defendants did misappropriate *certain of* AIS' trade secret drawings." Dkt. 247 at 1-2 (emphasis added). The inclusion of the word "certain" suggests that the parties themselves understood that the TSO applied to some—but not all—of the gyroscope drawings at issue in the case. Moreover, the Final Pretrial Conference Order expressly references the 12000 series gyroscopes. See Dkt. 259 at 3-5. For example, the order sets forth as an admitted fact that "[n]either BAE, nor

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| CIVIL MINUTES - GENERAL | | | 'O'   JS-6 |
|---|---|---|---|
| Case No. | 2:08-cv-02947-CAS(PJWx) | Date | June 18, 2015 |
| Title | ATLANTIC INERTIAL SYSTEMS INC. V. CONDOR PACIFIC INDUSTRIES OF CALIFORNIA, INC. ET AL. | | |

its successors in interest AIS and/or Goodrich, have manufactured the 12000 series gyroscope since they closed the Westlake Village facility in early 2006." Id. at 5. If the TSO applied to the entirety of the intellectual property at issue in this lawsuit, presumably the Final Pretrial Conference Order would have stated as much instead of calling attention to the 12000 series gyroscope.

Finally, the Court's order denying plaintiff's motion for, inter alia, an award of royalty and a permanent injunction also indicates that the TSO only applied to the 12000 series gyroscope drawings. Tellingly, the Court found that the public interest would not be served by permanently enjoining defendants from misusing plaintiff's trade secrets, since testimony at trial demonstrated that AIS "has stopped producing the subject 12000 series gyro," and thus declined to grant "an injunction precluding the only supplier of the gyros and parts at issue . . . ." Dkt. 345 at 10. It follows that, in granting the TSO, the Court found defendants liable solely for misappropriating the 12000 series gyroscope drawings.

AIS resists this conclusion, asserting that the TSO constituted a "sweeping ruling" with respect to Condor's liability, finding defendants liable for misappropriating "all of AIS' intellectual property," as alleged in the first amended complaint. Pl.'s Response to Defs.' Opening Br. at 2. Although there is some support for this position in the Final Pretrial Conference Order, see dkt. 259 at 7 (stating that "Claim 5: Misappropriation of Trade Secrets (Drawing Packages)" has been adjudicated with respect to liability), the TSO is premised almost entirely upon the Court's view that the 12000 series drawings were a "smoking gun" as to misappropriation—but they were only a "smoking gun" as to misappropriation of the 12000 series gyroscope. AIS further asserts that, in light of the Final Pretrial Conference Order, it "would have been precluded[] from producing further proof as to liability" at trial for the other allegedly misappropriated parts. Pl.'s Response to Defs.' Opening Br. at 2. If AIS had any concerns regarding the scope of the Final Pretrial Conference Order, it should have raised such concerns long ago. See Pierce Cnty. Hotel Employees & Rest. Employees Health Trust v. Elks Lodge, B.P.O.E. No. 1450, 827 F.2d 1324, 1329 (9th Cir. 1987) ("Issues not preserved in the pretrial order are eliminated from the action."); see also Southern Cal. Retail Clerks Union & Food Employers Joint Pension Trust Fund v. Bjorklund, 728 F.2d 1262, 1264 (9th Cir. 1984)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**        'O'   JS-6

| Case No. | 2:08-cv-02947-CAS(PJWx) | Date | June 18, 2015 |
|---|---|---|---|
| Title | ATLANTIC INERTIAL SYSTEMS INC. V. CONDOR PACIFIC INDUSTRIES OF CALIFORNIA, INC. ET AL. | | |

(failure to include issue in pretrial order constituted waiver, even though raised earlier in the proceeding).

Accordingly, the Court concludes that the reasonable royalty must be based upon defendants' misappropriation of the 12000 series gyroscope drawings submitted by Condor II to the U.S. government.

**C.    Amount of the Royalty Award**

As explained by the California Court of Appeal, to determine the measure of a reasonable royalty, a "court calculates what the parties would have agreed to as a fair licensing price at the time that the misappropriation occurred." Ajaxo, 187 Cal. App. 4th at 1308.  The parties assert that this analysis should be guided by the factors set forth in Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) modified sub nom. Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers, Inc., 446 F.2d 295 (2d Cir. 1971).  See Telemac Corp. v. US/Intelicom, Inc., 185 F. Supp. 2d 1084, 1100 (N.D. Cal. 2001) ("Georgia–Pacific sets forth fifteen factors the courts generally consider in a reasonable-royalty analysis.").  These factors, first applied in the context of patent infringement litigation, are as follows:

1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.

3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                    'O'   JS-6

| Case No. | 2:08-cv-02947-CAS(PJWx) | Date | June 18, 2015 |
|---|---|---|---|
| Title | ATLANTIC INERTIAL SYSTEMS INC. V. CONDOR PACIFIC INDUSTRIES OF CALIFORNIA, INC. ET AL. | | |

5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

6. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

7. The duration of the patent and the term of the license.

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          'O'   JS-6

| Case No. | 2:08-cv-02947-CAS(PJWx) | Date | June 18, 2015 |
| --- | --- | --- | --- |

| Title | ATLANTIC INERTIAL SYSTEMS INC. V. CONDOR PACIFIC INDUSTRIES OF CALIFORNIA, INC. ET AL. |
| --- | --- |

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

Georgia-Pacific., 318 F. Supp. at 1120.

These factors, however, are neither exclusive nor necessarily pertinent to every reasonable royalty analysis.  Id. (describing the enumerated considerations as "some of the factors *mutatis mutandis* seemingly more pertinent to the issue [at hand].""); Altavion, 226 Cal. App. 4th at 67 (considering "a number of circumstances," including the extent of the misappropriating party's use of the trade secret, the market for the secret, and the parties' pre-misappropriation negotiations concerning the secret, without reference to Georgia-Pacific factors); see also Faulkner v. Gibbs, 199 F.2d 635, 639 (9th Cir. 1952) ("There is no mathematical formula for the determination of a reasonable royalty. . . . [E]ach case must be controlled by those [facts] peculiar to it and, except in rare instances, the [royalty] can only be determined by reasonable approximation.").  Indeed, in University Computing, the Fifth Circuit described the inquiry as follows:

In calculating what a fair licensing price would have been had the parties agreed, the trier of fact should consider such factors as [1] the resulting and foreseeable changes in the parties' competitive posture; [2] what prices past purchasers or licensees may have paid; [3] the total value of the secret to the plaintiff, including the plaintiff's development costs and the importance of the secret to the plaintiff's business; [4] the nature and extent of the use the defendant intended for the secret; and [5] finally whatever other unique

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          'O'  JS-6

| Case No. | 2:08-cv-02947-CAS(PJWx) | Date | June 18, 2015 |
| --- | --- | --- | --- |
| Title | ATLANTIC INERTIAL SYSTEMS INC. V. CONDOR PACIFIC INDUSTRIES OF CALIFORNIA, INC. ET AL. | | |

factors in the particular case which might have affected the parties'
agreement, such as the ready availability of alternative processes.

504 F.2d at 539.

Under any analysis, the Court's ultimate task is to "declare[] the equitable terms
of[] a supposititious license," <u>Altavion</u>, 226 Cal. App. 4th at 68, based upon the
"hypothetical negotiations" of the parties at the time the misappropriation occurred,
<u>Georgia-Pacific</u>, 318 F. Supp. at 1122. <u>See id.</u> at 1136 (accounting for the "relative
bargaining positions of the parties and the economic realities of th[e] particular
situation."). "The drawing of proper conclusions from conflicting evidence concerning
the amount of a reasonable royalty has been said to call 'for the exercise of judicial
discretion by the District Court.' " <u>Georgia-Pacific</u>, 318 F. Supp. at 1120. With these
guiding principles in mind, the Court proceeds to discuss the evidentiary factors pertinent
to the instant case.

**1.     Expert Opinion**

Both parties proffer expert testimony concerning the amount of a reasonable
royalty. AIS profferes the expert opinion of Neil Beaton, the Partner in Charge of
Valuation Services at Grant Thornton LLP, a public accounting and business advisory
firm, who specializes in business valuations, mergers and acquisition analysis, litigation
support and economic analysis. Newhouse Decl., Ex. R at 3 (report of Neil Beaton).
Defendants offer the expert opinion of David Drews, a principal with IPmetrics LLC, an
intellectual property consulting firm, who has over twenty-five years' experience as a
financial analyst primarily concentrated in valuing intellectual property such as
trademarks, copyrights, trade secrets, and know-how. Drews Decl., Ex A at App'x A
(report of David Drews). Both experts apply the <u>Georgia-Pacific</u> factors to their
reasonable royalty analysis but reach divergent results. Beaton concludes that AIS is
entitled to a $1.55 million dollar royalty, Beaton Report at 20, whereas Drews concludes
that, if AIS is entitled to any royalty, it should be "1.0% of the royalty base," or
$4,837.00, Drews Report at 3.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          'O'   JS-6

| Case No. | 2:08-cv-02947-CAS(PJWx) | Date | June 18, 2015 |
|---|---|---|---|
| Title | ATLANTIC INERTIAL SYSTEMS INC. V. CONDOR PACIFIC INDUSTRIES OF CALIFORNIA, INC. ET AL. | | |

Neither conclusion is determinative. Beaton's analysis is fundamentally flawed because it is based on the assumption that AIS is entitled to a reasonable royalty for defendants' misappropriation of *both* the 11000 series and the 12000 series gyroscopes. See generally Beaton Report. In light of the Court's conclusion that the Terminating Sanctions Order only applied to the 12000 series, Beaton's proposed royalty is significantly overestimated. On the other hand, Drews confines his analysis to the 12000 series, proposing a royalty baseline of $483,710—defendants' gross sales of 12000 series products during the 30-weeks[4] following defendants' acquisition of the 12000 series drawings in 2007. Drews Report at 3-5. In turn, Drews' conclusion that the royalty rate should be 1.0% of $483,710 is based upon a 1.0 % to 7.0 % "range of royalty rates in [] four comparable agreements." Id. at 8. Drews, however, neglects to explain how these agreements are "comparable" to the suppositious license the Court must construct. See Georgia-Pacific, 318 F. Supp. at 1137 (rejecting evidence of prior licensing arrangement between plaintiff and third party where the "circumstances . . . were basically different from those that would have been applicable to the negotiations of a reasonable royalty between two keen competitors."). Instead, Drews appears to assume that these agreements are necessarily comparable because they involved the aerospace industry.

In sum, although both expert reports address evidentiary considerations relevant to the instant analysis, discussed infra, the royalty amounts ultimately endorsed are untethered to the fundamental inquiry: In 2007, what license would the parties have agreed to for production of the 12000 series gyrosscopes given their respective bargaining positions and then-existing economic realties?

**2.     Royalties Received by AIS for Licensing the 12000 Series Gyroscopes**

AIS contends that a September 24, 2010 licensing agreement between AIS and non-party Instrument Tech Corporation (the "Instrument Tech Agreement") is probative

---

[4] This 30-week period is, in turn, premised on defendants' contention that any royalty should be limited to the time it would haven taken Condor II to reverse engineer the 12000 series drawings.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES - GENERAL | | 'O'   JS-6 |
|---|---|---|---|
| Case No. | 2:08-cv-02947-CAS(PJWx) | Date | June 18, 2015 |
| Title | ATLANTIC INERTIAL SYSTEMS INC. V. CONDOR PACIFIC INDUSTRIES OF CALIFORNIA, INC. ET AL. | | |

of the instant royalty calculation.[5]  This agreement permitted Instrument Tech to use AIS' drawings and part numbers to procure and/or manufacture certain AIS gyroscope parts for the purpose of repairing the 11000 series gyroscopes.  Beaton Report at 7.  Under the terms of the Instrument Tech Agreement, Instrument Tech was required to pay AIS $1,600 per gyroscope repaired.  Id.  Beaton divided this $1,600 per unit rate by the price AIS charged for repairing gyroscopes, and calculated a royalty rate of 26% for the value of AIS's intellectual property.  Id.

The Court concludes that the Instrument Tech Agreement is not directly analogous to the instant analysis.  As discussed above, AIS is only entitled to an award of royalties for defendants' misappropriation of designs for the 12000 series gyroscope.  The Court agrees with defendants that a licensing agreement that (1) concerns the repair, rather than manufacturer of gyroscopes, and (2) involves the 11000 series, rather than 12000 series gyroscopes, is of little relevance to the determination of a hypothetical licensing agreement to manufacture the 12000 Series gyroscope.  See Georgia-Pacific, 318 F. Supp.  at 1140 ("[D]ata as to a royalty rate and cursory information as to the nature of a particular license transaction are gravely deficient in probative value.").

### 3.     Duration of Trade Secrets and the Term of the License.

Defendants correctly point out that the duration of a hypothetical license for use of the 12000 series drawings is informed by limitations delineated in the CUTSA.  Under the CUTSA, the relevant time period for calculating a royalty award must be "no longer than the period of time the use [of the trade secret] could have been prohibited."  Cal. Civ. Code § 3426.3(b); see also Univ. Computing Co., 504 F.2d at 534 ("Unlike a patent which is totally protected for the period of time for which it is granted, the protection afforded a trade secret is limited—for it is protected only so long as competitors fail to duplicate it by legitimate, independent research.").  Further, reverse engineering or independent derivation of a trade secret does not constitute misappropriation within the meaning of the CUTSA.  Cal. Civ. Code § 3426.1(a).

---

[5] AIS' expert, Beaton, relies extensively on the Instrument Tech Agreement in reaching the conclusion that a $1.55 million royalty award is appropriate.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL          'O'   JS-6

| Case No. | 2:08-cv-02947-CAS(PJWx) | Date | June 18, 2015 |
|---|---|---|---|
| Title | ATLANTIC INERTIAL SYSTEMS INC. V. CONDOR PACIFIC INDUSTRIES OF CALIFORNIA, INC. ET AL. | | |

Here, the testimony of one of AIS' own experts, Dr. Joel Hanse, indicates that defendants could have reverse engineered the 12000 series drawings in approximately eight months.  Defs.' Reply Br. at 14 (citing report of Joel Hanse at 22-23).  It follows, if Dr. Hanse's opinion is well-founded, that AIS only could have prohibited defendants from using the 12000 series drawings for a period of eight months following the 2007 misappropriation.  This time frame further undermines the $1.55 million royalty amount advocated by AIS, which AIS' expert assumed "would cover the damage period beginning in 2007 and extend[ing] through the assumed injunction date in early 2011." Beaton Report at 11.

### 4.      Parties' Commercial Relationship and the Value of 12000 Series Drawings to AIS

It is undisputed that AIS and defendants are direct competitors of one another, selling much of the same product line to the same customers.  That the parties are competitors weighs in favor of a higher royalty rate.  See Georgia-Pacific, 318 F. Supp. at 1124 ("[T]he granting of a license by USP to GP would place GP in direct and active competition with USP in the United States. . . . Obviously, only an adequate royalty would make this proposition palatable to USP.").

As defendants assert, however, it is also undisputed that AIS stopped manufacturing the 12000 series gyroscopes in 2006.  According to defendants, this demonstrates that the 12000 series drawings were of little to no value to AIS.  Defs.' Open'g Br. at 9-11.  Defendants, however, undermine their own contention by acknowledging that AIS' business strategy was "focused on pushing sales of newer, costlier, higher volume technology," such as the 11000 series gyroscope, "while discouraging demand for older, lower cost, low volume technology," such as the 12000 series.  Id. at 11; Beaton Depo. at 51:24-52:19 ("Q. So your understanding was that AIS's strategy was to migrate the government to, not in these words but in effect, better parts that may be more expensive? A. Yeah. . . . [H]istorically the U.S. government tried to buy parts that would obsolesce in two years, three years, maybe even four years so that they continued to keep their budgets going and buy product over time. AIS's strategy was to kind of wean them from that . . . onto a product that would last ten years . . .") (citing Beaton Depo. at 51:24-52:19).  Licensing the 12000 series drawings to defendants would

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES - GENERAL | | 'O'   JS-6 |
|---|---|---|---|
| Case No. | 2:08-cv-02947-CAS(PJWx) | Date | June 18, 2015 |
| Title | ATLANTIC INERTIAL SYSTEMS INC. V. CONDOR PACIFIC INDUSTRIES OF CALIFORNIA, INC. ET AL. | | |

not serve AIS' strategy of weaning the government onto newer, more expensive products. This consideration would have informed AIS' bargaining position in negotiating a license with defendants, and weighs in favor of a higher royalty.

However, perhaps the most probative evidence of the value AIS placed on the 12000 series drawings is found in documents related to an internal AIS task force known as "Project Raven." As AIS explains, in 2005, Project Raven was tasked with "determining a sales price for the 12000 series to Meltzner." Pl.'s Reply at 14.[6] The Project Raven memoranda cited by defendants stated: "Based on the above, we expect to negotiate a price between [$] 0 and [$] 400,000. Negotiation will be difficult, as Mr. Meltzner is well aware of the challenges [AIS] would face in moving such a product line." Project Raven ultimately concluded that a sale to Meltzner "did not look like an attractive business deal" because it would have resulted in a loss after accounting for transactional costs. Leader Decl. Ex N. 27:14-26:22. Although AIS attempts to minimize the Project Raven evidence as "internal speculation" that is "wholly irrelevant," Pl.'s Reply at 9, the Project Raven evidence most closely approximates AIS' own perception of its bargaining position in hypothetical licensing negotiations with defendants.

## 5.   The Nature and Extent of the Use Defendants Intended for the 12000 Series Drawings

The nature and extent of defendants' use of the 12000 series drawings counsels in favor of a higher royalty. Although defendants contend that the drawings had little value, since Condor II employees could assemble 12000 series gyroscopes from memory, defendants' position is belied by, in their own words, the government's "dire need of [the] 12000 Series" at the time defendants submitted a bid to produce them in 2007. Defs.' Opening Br. at 16. Defendants fulfilled that dire need and became an approved

---

[6] At the time, AIS was planning to shut down the Westlake Village Facility, where the 12000 series gyroscopes had been manufactured since the founding of Condor I, and was deciding whether to transition production to a larger facility in Cheshire, Connecticut, or to cease production of the 12000 series all together.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL ‘O’ JS-6

| Case No. | 2:08-cv-02947-CAS(PJWx) | Date | June 18, 2015 |
|---|---|---|---|
| Title | ATLANTIC INERTIAL SYSTEMS INC. V. CONDOR PACIFIC INDUSTRIES OF CALIFORNIA, INC. ET AL. | | |

supplier—by submitting direct copies of the 12000 series drawings sold by Condor I to BAE.

### 6. Summary

Applying the pertinent Georgia-Pacific factors to the instant case, the Court concludes that AIS is entitled to a royalty award that is limited to the eight month period in which Condor II could have reverse engineered the 12000 series gyroscopes. See Georgia-Pacific, 318 F. Supp. at 1120 (considering "duration of the patent."). The nature and extent of defendants' use of the drawings, and the parties' commercial status as competitors, are particularly relevant to this conclusion. See id. (considering "the extent to which the infringer has made use of the invention."). Here, defendants not only used the misappropriated drawings, they used them to gain access to government contracts for which the parties compete. See id. (considering "[t]he commercial relationship between the licensor and licensee, such as, whether they are competitors . . . ."). This use fulfilled the government's "dire need" for the 12000 series gyroscopes and generated $483,710 in revenue for defendants during the relevant eight month period. See id. (considering the "licensor's established policy and marketing program to maintain his patent monopoly" along with "the benefits to those who have used the invention"). Plainly, Condor II valued the drawings and likely would have been willing to pay AIS a significant royalty rate in order to lawfully submit them to the government.

AIS, however, is not entitled to all of the revenue generated by defendants' misappropriation. As indicated by the Project Raven evidence, AIS valued the entire 12000 series at no more than $400,000. See id. (considering evidence of "[t]he amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon . . . .").

Further, while the Instrument Tech Agreement is not an ideal approximation of the supplositious agreement between the instant parties, that AIS commanded a 26% royalty rate for repair of the 11000 series is nonetheless relevant to the analysis. See id. (considering "[t]he opinion testimony of qualified experts" and other "royalties received by the patentee" ). Indeed, AIS' proffered royalty rate is tethered to a gyroscope licensing agreement, whereas defendants' proffered 1.0% royalty rate is not.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**      **'O'   JS-6**

| Case No. | 2:08-cv-02947-CAS(PJWx) | Date | June 18, 2015 |
|---|---|---|---|
| Title | ATLANTIC INERTIAL SYSTEMS INC. V. CONDOR PACIFIC INDUSTRIES OF CALIFORNIA, INC. ET AL. | | |

In sum, adopting the 26% rate and applying it to the $483,710.00 generated by defendants' sales of the 12000 series over an eight month period, would yield a royalty of $125.764.60.  In light of all the factors and evidence adduced by the parties, the Court awards AIS a royalty of $125,000.

## III.   CONCLUSION

In accordance with the foregoing, AIS' request for a royalty pursuant to § 3426.3(b) is hereby GRANTED.  Defendants are ORDERED to pay AIS a royalty in the amount of $125,000.00.

IT IS SO ORDERED.

|  | 00 | : | 00 |
|---|---|---|---|
| Initials of Preparer | | CMJ | |